[936 NYS2d 233]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES
A. HARRIS, JR., Appellant.

Second Department, January 10, 2012

APPEARANCES OF COUNSEL

*James A. Harris, Jr.*, appellant pro se and *Warren S. Hecht*, Forest Hills, for James A. Harris, Jr., appellant.

*Francis D. Phillips II, District Attorney*, Goshen (*Andrew R. Kass* of counsel), for respondent.

## OPINION OF THE COURT

CHAMBERS, J.

This appeal raises two principal questions: whether the defendant's statement, during a custodial interrogation, "I think I want to talk to a lawyer," unequivocally invoked his right to counsel, and, if so, whether the statements subsequently given by the defendant in the absence of counsel must be suppressed. We answer both questions in the affirmative, and conclude that the hearing court's error in failing to suppress these statements was not harmless beyond a reasonable doubt and, therefore, the defendant is entitled to a new trial.

### Factual Background

On September 17, 2006, a group of children alerted patrol officers from the City of Newburgh Police Department that they detected a foul odor and fluid emanating from a red sedan. Police officers opened the trunk, and discovered the decomposing body of Franklin Fitts, who had been bound and gagged. An autopsy revealed that Fitts had been dead for two or three days before his body was found, and the cause of death was blunt force trauma to the head and asphyxia. From the beginning of the criminal investigation into the death of Fitts, the New York State Police focused its attention on the residence of the codefendant, James Blagmon, because it received information that Fitts had ties to that residence, and that Blagmon was under investigation for selling and distributing drugs there. On September 18, 2006, while the residence was under police surveillance, the defendant was observed driving a Mazda in the vicinity. By radio transmission, Investigator Paul DeQuarto, who was following the Mazda in an unmarked car, directed a patrol officer to stop the vehicle. When the Mazda pulled into a nearby gas station, the officer activated the lights on a squad car and pulled behind the Mazda. Since the defendant had reached toward the glove compartment, the officer handcuffed

the defendant and detained him until Investigator DeQuarto arrived. While the defendant was still in handcuffs, Investigator DeQuarto asked the defendant if he would go to the nearby State Police Troop headquarters for an interview. The defendant inquired as to the subject matter, and Investigator DeQuarto said he would tell him when they reached headquarters. The defendant, who was not told he was free to leave, agreed. The defendant rode with a state trooper to the State Police Troop headquarters in a police car.

After he arrived at the headquarters, the defendant was placed in an interview room measuring 8 feet by 10 feet, at which time his handcuffs were removed. Approximately 1½ hours later, Investigator DeQuarto and Detective Rolando Zapata began questioning the defendant. At 9:58 P.M. on September 18, 2006, after his pedigree information was obtained, the defendant was given *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]), and he agreed to speak with the investigator and the detective.

The defendant was questioned about his whereabouts on September 14, 2006, and he first claimed that he never left his home after 9:00 P.M. on that night, but subsequently admitted that he met Blagmon for drinks at a bar late that evening. Approximately one hour into the interview, and after the defendant was moved to a classroom so that he could smoke a cigarette, Investigator DeQuarto told him that the State Police were conducting an investigation into the homicide of Fitts, and indicated to him that he was considered a suspect. Investigator DeQuarto asked the defendant to provide a DNA sample and, after initially refusing, the defendant agreed. The defendant repeatedly denied any involvement in the death of Fitts, prompting the police to request, at least eight times, that he take a polygraph examination. Each time, the defendant refused. When shown, for the second time, a photograph of Fitts bound and gagged in the trunk of Fitts's own car, the defendant again disavowed any involvement in his death and, said, crucially, "I think I want to talk to a lawyer and I want to go." At 1:05 A.M. on September 19, 2006, the investigator and the detective ended the questioning, and the defendant was escorted to the lobby and permitted to leave.

On September 22, 2006, the defendant returned to the State Police Troop headquarters to retrieve the Mazda in which he had been stopped and apprehended. By then, Blagmon's girlfriend, Shanicqua Mitchell, had implicated Blagmon and the

defendant in the murder. Investigator DeQuarto, having learned that the defendant was at the State Police Troop headquarters, told him that he wanted to ask him additional questions. After the defendant was again advised of his *Miranda* rights, he was questioned, and he admitted that on the night of September 14, 2006, shortly before the murder, he went to Blagmon's home before heading to a bar with him at around midnight on September 15, 2006. The defendant initially stated that he remained at the bar until 4:00 A.M., when a friend of his drove him home. The defendant stated that he went to bed with his girlfriend and did not awake until 10:00 or 11:00 A.M. on September 15, 2006. However, when the police showed the defendant phone records indicating that he had called his girlfriend at 6:00 A.M. on September 15, 2006, the defendant then admitted that he had not been home that morning.

According to the defendant's statement, after he went home, he spoke with Blagmon, who asked for the defendant's help and wanted him to come over to his home. The defendant explained that, at approximately 5:00 A.M. on September 15, 2006, he went to Blagmon's home, but claimed that he did not go inside. The defendant admitted that Blagmon had said that he needed to get "this" out of here, but he denied knowing what Blagmon meant by "this," and he explained that he only knew that Blagmon was going to drive Fitts's car, while he followed behind in Blagmon's car. According to the defendant, he and Blagmon drove from Middletown, New York, to Newburgh, where they left Fitts's car. Afterwards, the defendant and Blagmon returned to Middletown. The defendant stated that he did not know that Fitts's body was in the trunk of Fitts's car.

At 2:50 A.M. on September 23, 2006, the police ended the interview of the defendant, the defendant was placed under arrest, and he was handed over to uniformed state troopers for arrest processing. However, during the processing, and while waiting for arraignment, the defendant repeatedly requested to speak with Investigator DeQuarto, announcing that he had more details about the crime and Blagmon's involvement in it. Ultimately, the defendant was re-interviewed, and he confessed that, when he went to Blagmon's home, he saw Fitts bloodied and bound, but alive. The defendant said that Blagmon struck Fitts twice in the head with a piece of wood, and that the defendant then helped Blagmon carry Fitts outside and placed him in the trunk of Fitts's car. As recounted by the defendant, before he and Blagmon left the Blagmon residence, Blagmon

called Mitchell to come downstairs, and he told her to clean up. The defendant stated that Blagmon drove Fitts's car to Newburgh, while he followed behind in Blagmon's car. The defendant explained that Fitts's car was left in Newburgh, and that the defendant and Blagmon then drove back to Middletown in Blagmon's car. Investigator DeQuarto transcribed the interrogation into a 10-page report, and the defendant signed it.

Following a hearing, the County Court determined that when the police first questioned the defendant about the murder on September 18, 2006, a reasonable person, innocent of any crime, would not have believed that it was permissible to leave and, thus, the defendant was in police custody. Since the police lacked probable cause to arrest the defendant, the County Court suppressed the statements the defendant made on September 18, 2006, from use in the prosecution's case-in-chief. The County Court ultimately denied that branch of the defendant's motion which was to suppress the statements he made to the police when he was subsequently interviewed on September 22, 2006, and into September 23, 2006, finding that the statements had been voluntarily made after the defendant had been advised of and waived his *Miranda* rights (*see Miranda v Arizona*, 384 US 436 [1966]), and that those statements were sufficiently attenuated from the unlawful police conduct on September 18, 2006. In ruling that those statements were admissible, the County Court concluded that, on September 18, 2006, the defendant did not unequivocally invoke his right to counsel when he told police, "I think I want to talk to a lawyer and I want to go."[1]

The matter proceeded to trial, where the statements the defendant made on September 22, 2006, and September 23, 2006, were used against him. In addition to these statements, the prosecution presented evidence circumstantially connecting the defendant to the underlying crimes, as well as alleged admissions made by the defendant to five witnesses. Four of these witnesses testified pursuant to cooperation agreements with the prosecution.

Mitchell, who was Blagmon's wife by the time of trial, and the mother of two children, ages 4 and 11, respectively, entered into a cooperation agreement with the prosecution after being charged with an unrelated drug offense. She testified that she

---

1. Although the County Court suppressed the statements that the defendant made to police on September 18, 2006, in light of the fact that the defendant's other statements were permitted to be admitted into evidence, he consented to the admission of his statements made on September 18, 2006.

observed the defendant in the basement of Blagmon's residence at approximately 6:00 A.M. on September 15, 2006. She testified that at that time, there was blood in the basement, on the carpet, on a metal pipe, and on boots that the defendant was wearing. According to Mitchell, she also observed a bag with gloves at the residence, and that Blagmon motioned to the pipe and bag, indicating that they were out of place, and that then he and the defendant left the residence. As Mitchell testified, while they were gone, she cleaned up the basement, wiping blood from the pipe and other surfaces, and removing a piece of rug. She explained that she collected the soiled items, and placed them in a pile, but later noticed that they were gone. Mitchell further testified that, the next day, she helped Blagmon paint the basement of the residence. Mitchell was not charged with any crime for helping to clean the basement.

Erica Morales, the defendant's ex-girlfriend, testified that, after the police finished questioning the defendant for the first time, on September 18, 2006, she spoke with the defendant, asking him why he was arrested. He replied that he thought Blagmon had killed Fitts, explaining that he went down to Blagmon's basement and he saw Fitts sitting in a chair, beaten up, but that Fitts was alive. She also testified that she removed clothing belonging to the defendant that was at her apartment and gave it to a childhood friend of the defendant, Gerald Shears, at Shears's request. As recounted by Morales, those clothes included, a shirt, jeans, and Timberland boots, on which she noted that there were brown stains. For her acts, Morales was charged with tampering with physical evidence, a class E felony. She entered into a cooperation agreement with the prosecution to provide truthful testimony. In exchange, she was permitted to plead to a reduced charge of a class A misdemeanor, and to have a criminal mischief charge unrelated to this case dismissed.

Gerald Shears testified that Morales gave him a bag full of clothing, which included several pairs of jeans, shirts, and a pair of Timberland boots, and that Morales told him to burn the clothes. He stated that he burned the clothes for a time, then put out the fire, and threw them in a dumpster. As Shears testified, when he told the defendant what he had done, the defendant told him to get rid of the clothes because it looked bad, at which point Shears took the clothes and threw them in a stream. For his acts, Shears was charged with tampering with physical evidence, and he testified under a cooperation agreement which,

like Morales, reduced his charge from a class E felony to a class A misdemeanor.

Nora Chayka, with whom the defendant previously had a sexual relationship, testified that the defendant asked her to provide him with a false alibi, a fact which the defendant admitted during his testimony.

Daniel Maiurro, a jailhouse informant and three-time convicted felon on parole, facing a felony charge of driving while intoxicated, testified about a number of details the defendant allegedly told him about the crime. These details included: that the defendant helped bind Fitts with tape; that the defendant struck Fitts five or six times with a pipe and delivered the fatal blow; that a piece of a latex glove became stuck in Fitts's mouth as they were taping him up; that the defendant helped place Fitts's body in the trunk of the car; and that the defendant had his girlfriend, with the help of a friend he called "G" (referring to Shears), dispose of the clothes that the defendant was wearing. For Maiurro's cooperation, the prosecution agreed to reduce his felony charge of driving while intoxicated to a misdemeanor.

The defendant's defense throughout the trial was that he had no knowledge that Fitts's body was in the trunk of Fitts's own car, and that he had been an unwitting accomplice in the disposal of Fitts's body. The defendant testified that he was wearing boots when, at Blagmon's request, he went to his home. The defendant further testified that he saw blood in the basement, which Blagmon asked Mitchell to clean up. However, according to the defendant, Blagmon indicated that he and Fitts had fought over money Fitts had stolen from his drug operation, and that Fitts subsequently left Blagmon's home. Blagmon, who had been living with Fitts, allegedly told the defendant that he removed Fitts's belongings from his apartment, and placed them in Fitts's car. The defendant averred that Blagmon asked him to help Blagmon get rid of Fitts's car by driving Blagmon's car behind Blagmon as Blagmon drove Fitts's car. The defendant explained that he agreed, and that he and Blagmon abandoned Fitts's car in Newburgh. On the return trip to Middletown, Blagmon told the defendant for the first time that Fitts was in the trunk of the abandoned car.

After hearing this evidence, the jury deliberated for two days, during which time they requested, among other things, to review the defendant's statements. The jury then returned a verdict convicting the defendant of murder in the second degree (felony murder), kidnapping in the first degree, and tampering with physical evidence.

### The Indelible Right to Counsel

The ultimate goal of this state's right-to-counsel jurisprudence has always been to achieve " 'a balance between the competing interests of society in the protection of cherished individual rights, on the one hand, and in effective law enforcement and investigation of crime, on the other' " (*People v Grice*, 100 NY2d 318, 322-323 [2003], quoting *People v Waterman*, 9 NY2d 561, 564 [1961]).

Thus, a suspect in custody who unequivocally requests the assistance of counsel may not be questioned further in the absence of an attorney (*see People v Grice*, 100 NY2d at 320-321; *People v Glover*, 87 NY2d 838, 839 [1995]; *People v West*, 81 NY2d 370, 373-374 [1993]; *People v Cunningham*, 49 NY2d 203, 209 [1980]). A defendant's unequivocal invocation of counsel while in custody results in the attachment of the right to counsel, indelibly so, meaning that, as a matter of state constitutional law, a defendant cannot subsequently waive the right to counsel unless the defendant is in the presence of an attorney representing that defendant (*see People v Grice*, 100 NY2d at 320-321; *People v Cunningham*, 49 NY2d at 205).

█ The County Court determined that, on September 18, 2006, when the defendant was first interrogated, he was in custody. Although, on appeal, the prosecution contends that the defendant was not in custody when he said, "I think I want to talk to a lawyer," CPL 470.15 (1) limits our jurisdiction to a determination of any question of law or issue of fact involving error which may have adversely affected the appellant. Since we are reviewing a judgment on the defendant's appeal, and the issue of whether the defendant was in custody was not decided adversely to him, we are jurisdictionally barred from considering that issue (*People v Concepcion*, 17 NY3d 192 [2011]; *People v LaFontaine*, 92 NY2d 470, 473-474 [1998]; *People v Sedunova*, 83 AD3d 965, 967 [2011]). In any event, we agree with the County Court's conclusion that a reasonable person, innocent of any crime, would not have believed he was free to leave the presence of the police (*see People v Yukl*, 25 NY2d 585, 589 [1969], *cert denied* 400 US 851 [1970]; *People v Ellerbe*, 265 AD2d 569, 570 [1999]). In this regard, after the defendant's vehicle was stopped, he was placed in handcuffs and detained until Investigator DeQuarto arrived at the scene. Investigator DeQuarto asked the defendant, while in handcuffs, if the defendant would accompany him back to the State Police Troop headquarters for questioning, but refused to tell him the subject

matter. Still handcuffed, the defendant was transported to those headquarters in a police car. At headquarters, the defendant was given *Miranda* warnings, and then questioned for more than three hours. During the interview, the police told the defendant that they were investigating a homicide, twice showed him a photograph of the deceased, and indicated to him that he was a suspect (*see People v Duncan*, 295 AD2d 533, 534 [2002]). He was asked to give a DNA sample and, on at least eight occasions, to take a polygraph examination, after having repeatedly denied any involvement in Fitts's death (*People v Robbins*, 236 AD2d 823, 824-825 [1997]).[2] The interview only terminated when the defendant stated, "I think I want to talk to a lawyer and I want to go." Taken together, these facts establish that the defendant was in custody (*see People v Centano*, 76 NY2d 837, 837-838 [1990]; *People v Parsad*, 243 AD2d 510 [1997]).

Whether the defendant unequivocally invoked his right to counsel is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request, including the defendant's demeanor, manner of expression, and the particular words found to have been uttered by the defendant (*see People v Mitchell*, 2 NY3d 272, 276 [2004]; *People v Glover*, 87 NY2d at 839; *People v Jones*, 21 AD3d 429 [2005]). The question is whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" (*Davis v United States*, 512 US 452, 459 [1994]; *People v Jones*, 21 AD3d at 429).

In *People v Esposito* (68 NY2d 961 [1986]), for example, after the defendant was arrested and taken to a police station, where he was advised of his rights and confronted with statements from the complaining witness and her mother, he said, "I might need a lawyer" (*id.* at 962). A police officer inquired as to whether the defendant had an attorney, and then provided him with a phonebook. The defendant then, without the assistance of counsel, made statements in response to police questioning, and also signed a consent form authorizing the police to search his cabin. The Court of Appeals held that those statements and the evidence seized from the defendant's cabin should have been suppressed in light of the Appellate Division's "finding that the defendant's initial statement to the police officer regarding an attorney constituted a request for counsel" (*id.*).

---

**2.** The defendant's refusal to take a polygraph examination should not have been elicited at trial (*see People v Wynters*, 298 AD2d 852, 853 [2002]; *People v Grice*, 100 AD2d 419, 421 [1984]).

In *People v Porter* (9 NY3d 966 [2007]), the defendant said, "I think I need an attorney," and the interviewing officer wrote, in his notes, that the defendant was "asking for an attorney" (*id.* at 967). While the Court of Appeals noted that the words the defendant used would not in every instance constitute an unequivocal invocation of a request for counsel, when coupled with the officer's notation and without any other additional facts upon which a contrary inference could be drawn, the request for counsel in that case was unequivocal.

In *People v Jones* (21 AD3d at 429), the police questioned the defendant on suspicion that he had stolen certain property from his employer. During the course of the interview, the defendant mentioned three times that maybe he should consult with counsel, stating, "maybe you should talk to my attorney about it," "maybe I should talk to my attorney," and "I think maybe I should talk to my attorney." In each instance, instead of clarifying whether the defendant was requesting counsel (*see Davis v United States*, 512 US at 461; *People v Powell*, 304 AD2d 410, 411 [2003]), the detective told him that it was his right to have counsel, but then proceeded to question him further and, at one point, posed a hypothetical question about two bank robbers, and the consequences for the one who cooperated as opposed to the one who did not. The defendant then admitted to stealing from his employer in order to help his family. The County Court concluded that the defendant did not unequivocally invoke his right to counsel. On appeal, we disagreed, holding that "the defendant's statements, viewed in context, articulated his desire to have counsel present such that a reasonable police officer should have understood that he was requesting an attorney" (*People v Jones*, 21 AD3d at 429).

In *People v Wood* (40 AD3d 663 [2007]), the defendant was questioned by police in connection with a murder investigation. The defendant provided an oral account of his whereabouts on the day of the murder, which was memorialized by a detective. The detective asked the defendant if he was willing to make a statement on video, and the defendant responded, "I think I should get a lawyer" (40 AD3d at 664). The detective immediately said, "ok," terminated the interview, handed the defendant a telephone, and left the room. The detective returned to the room, and the defendant's statement was videotaped, and later admitted into evidence at trial. On appeal, for the first time, the defendant argued that he had unequivocally invoked his right to counsel. We agreed, but concluded that the error was harmless beyond a reasonable doubt.

On petition for a writ of habeas corpus, the United States Court of Appeals for the Second Circuit unanimously agreed with our conclusion in *Wood* that the defendant had unequivocally invoked his right to counsel (*see Wood v Ercole*, 644 F3d 83 [2011]).[3] Analyzing the defendant's request, the court determined that the language employed by the defendant constituted "objectively clear language" and evidenced "no internal debate whatsoever" (*id.* at 91-92). Further, the circumstances surrounding the interrogation erased any possible ambiguity. The court noted that the defendant had been held for 24 hours and subjected to various interrogation techniques. The defendant complied with every request made by the police up until the time when he was faced with the prospect of having his statement recorded, at which point he expressed a desire for counsel. Upon hearing the defendant's request, the detective handed the defendant a telephone, demonstrating that he understood the request to be "unambiguous."

As noted by the Court of Appeals in *Porter* and the Second Circuit in *Wood*, there may be some instances where language identical or similar to that used here may be equivocal. However, this is not one of those instances. Indeed, in those cases and others, law enforcement officers hearing similar requests have perceived the request to be unequivocal (*see Davis v United States*, 512 US at 455 [naval investigative agents ceased questioning the defendant when he said, "I think I want a lawyer before I say anything else"]; *People v Porter*, 9 NY3d at 967 [officer wrote down that the defendant asked for a lawyer when he said, "I think I need an attorney"]; *Wood v Ercole*, 644 F3d at 87 [in response to the phrase "I think I should get a lawyer," a detective provided the defendant with a telephone and left the room]; *Cannady v Dugger*, 931 F2d 752, 755 [1991] [noting that the officer understood that the defendant was requesting counsel when he said, "I think I should call my lawyer," because the officer pushed the phone toward the defendant and waited for him to make a call]; *see also United States v McGee*, 2000 US Dist LEXIS 15066, *24-25 [WD NY 2000] [noting that, in *Davis*, the statement, "I think I want a lawyer before I say anything else," was unambiguous]).

▮ Although our inquiry is an objective one (*see Abela v Martin*, 380 F3d 915, 926 [2004]; *People v Jones*, 21 AD3d at

---

**3.** The Second Circuit majority disagreed with our conclusion that the error was harmless beyond a reasonable doubt and, consequently, granted the defendant's petition for a writ of habeas corpus.

429), the fact that the officers in *Davis*, *Porter*, *Wood*, and *Cannady* understood similar words to mean that the defendant was requesting counsel confirms our conclusion that the request here was unambiguous. In this case, while the investigator and the detective may not have made a notation that the defendant was requesting counsel or handed him a phone, the circumstances demonstrate that they understood what the defendant was requesting. The defendant couched his request as a *desire* for the assistance of counsel and to be released, actually presenting the investigator and the detective with two options (*see Davis v United States*, 512 US at 459 ["a suspect need not speak with the discrimination of an Oxford don" (internal quotation marks omitted)]). Either the investigator and detective could terminate the interview and release the defendant from custody or, if they wanted to continue questioning the defendant, they would have to provide him with an attorney. By expressing his desire for assistance of counsel, the defendant—who was a suspect in a murder investigation, twice shown a photograph of the deceased, and asked at least eight times to take a polygraph examination—gave voice to his belief that, without the benefit of legal counsel, he could not deal with the police alone (*see People v West*, 81 NY2d at 374; *People v Grimaldi*, 52 NY2d 611, 616 [1981]; *People v Cunningham*, 49 NY2d at 209). And crucially, Investigator DeQuarto clearly understood what the defendant was requesting, as evidenced by the fact that he terminated the interview rather than scrupulously honor the defendant's request and provide him with an attorney. Taken in full context, the defendant's statement is subject to no other reasonable interpretation.

Since the defendant unequivocally invoked his right to counsel while in police custody, it indelibly attached. Once the right attached, the police were prohibited from questioning the defendant without first obtaining a waiver of his right to counsel in the presence of an attorney; the police were not permitted to cajole or otherwise induce the defendant to answer further questions without first affording the defendant an attorney. Since such a counseled waiver was not obtained, the statements that the defendant made to the police on September 22, 2006, and September 23, 2006, should have been suppressed.[4]

---

4. At any subsequent retrial, contrary to the County Court's conclusion, certain statements that the defendant made to Troopers Michael Sumnick and James Charlonis during the booking process would not be admissible. Nor

## Harmless Error

 The failure to suppress the defendant's statements was error of constitutional magnitude. This error can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant's conviction (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *People v Windley*, 70 AD3d 1060 [2010]; *People v Nadal*, 57 AD3d 574, 575 [2008]). Thus, the error must be harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d at 237). As the Court of Appeals suggested in *Crimmins*, it is "perhaps the most demanding test yet formulated" (*id.* at 241; *see People v Almestica*, 42 NY2d 222, 227 [1977, Cooke, J., dissenting] [noting that this standard places a "heavy burden" on the prosecution]; *see also People v Schaeffer*, 56 NY2d 448, 456 [1982] [noting that the test is "strict, though not unrealistic"]).

In this instance, while the evidence of guilt was overwhelming, there is a reasonable possibility that the error contributed to the defendant's conviction.

There was no direct evidence linking the defendant to the murder of Fitts. Instead, as noted, the evidence of the defendant's guilt consisted of circumstantial evidence or alleged admissions he made. Importantly, most of the witnesses who provided this evidence had an interest in giving testimony favorable to the prosecution. Mitchell, Morales, and Shears all played some role in helping to cover up the murder. Mitchell was the mother of two children, her husband was facing murder charges, and she had been charged with an unrelated drug offense. Morales, also a mother, was the defendant's ex-girlfriend, and had been charged with felony tampering with evidence. Shears, too, had been charged with felony tampering with evidence. Maiurro had a lengthy criminal history, having already been convicted of three felonies, and he was facing charges of felony driving while intoxicated and violation of the terms and conditions of his parole. Each of these witnesses testified pursuant to a cooperation agreement with the prosecution. Consequently, the defendant's

---

would the written statement that the defendant gave to Investigator Stephen Riordan be admissible. These statements were not truly spontaneous and, therefore, do not fit within that narrow exception to the rule that statements made by a defendant who possesses an indelible right to counsel must be suppressed (*see People v Gonzales*, 75 NY2d 938, 939-940 [1990], *cert denied* 498 US 833 [1990]; *People v Lucas*, 53 NY2d 678, 680 [1981], *cert denied* 474 US 911 [1985]; *People v Grimaldi*, 52 NY2d at 617; *People v Maerling*, 46 NY2d 289, 302-303 [1978]).

statements to the police on September 22, 2006, and September 23, 2006, were crucial pieces of evidence. As has been long recognized, "confessions of crime, supremely self-condemnatory acts, are almost sure to weigh most heavily with fact finders" (*People v Schaeffer*, 56 NY2d at 455). Although the defendant tried to distance himself from the murder, nothing could have been more compelling than the details provided in his increasingly inculpatory statements, because they came from the defendant and because they corroborated the testimony of the prosecution's other witnesses (*see Bruton v United States*, 391 US 123, 139, 140 [1968, White, J., dissenting] ["(T)he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him"]). In his written statement, the defendant confessed that he had seen Fitts bloodied and bound, albeit alive. The defendant indicated that he had helped place Fitts's body in the trunk of Fitts's car, and that, before the defendant and Blagmon left Blagmon's residence, Blagmon called Mitchell downstairs and told her to clean up.

It is axiomatic that "[b]y their very nature, benefits conferred on a witness by a prosecutor provide a basis for the jury to question the veracity of a witness on the theory that the witness may be biased in favor of the People" (*People v Colon*, 13 NY3d 343, 350 [2009]; *see People v Savvides*, 1 NY2d 554, 557 [1956] ["It requires no extended discussion . . . to establish that the existence of . . . a promise (of leniency) might be a strong factor in the minds of the jurors in assessing the witness' credibility and in evaluating the worth of his (or her) testimony"]). Yet, through the admission of the defendant's statements that were made on September 22, 2006, and September 23, 2006, the witnesses were made to appear more credible than they otherwise might have appeared despite their biases, because the statements corroborated portions of the witnesses' testimony (*see People v Jackson*, 8 NY3d 869, 873-874 [2007, Pigott, J., dissenting] [positing that the admission of uncharged sexual assault against a witness "len(t) credibility" to the complainant's testimony by suggesting that, because the defendant had engaged in sexual misconduct with a witness, he was likely to have committed the acts charged]; *Wood v Ercole*, 644 F3d 83 [2011] [holding that the improper admission of the defendant's statement was not harmless error because it largely confirmed the codefendant's version of events, making the codefendant appear more credible]). It is not our suggestion, as our

dissenting colleague concludes, that the testimony of these witnesses was rendered incredible because they entered into cooperation agreements with the prosecution. Rather, the erroneous admission of the defendant's statements into evidence gave the jury less of a reason to question these witnesses' biases. In other words, the jury might not have credited the testimony of these witnesses had the statements the defendant made on September 22, 2006, and September 23, 2006, been excluded from evidence (*see People v Colon*, 13 NY3d at 349-350). Thus, "it could be said that the other trial evidence corroborated [the defendant's statements] and not the converse" (*People v Jones*, 61 AD2d 264, 268 [1978], *affd* 47 NY2d 528 [1979]; *see People v Foster*, 72 AD3d 1652, 1655 [2010] [in a prosecution for murder, the erroneous admission of statements that the defendant made to a confidential informant was not harmless beyond a reasonable doubt, as the statements corroborated eyewitness testimony and evidence found at the burial site of the victim and, thus, there was a reasonable possibility that those statements might have contributed to the defendant's conviction]).

Of course, as the dissent notes, the jury was aware that certain witnesses had entered into cooperation agreements with the prosecution. But that does not speak to the influence that the defendant's statements had on the jury, particularly in its assessment of those witnesses' credibility.

In contrast, the defendant, faced with the prospect that his inconsistent and inculpatory statements would be used against him on the prosecution's direct case, was obligated to testify on his own behalf, explaining, in his words, that the police had put "stuff" in his head to say. The inconsistent statements that the defendant made to the police undoubtedly damaged his credibility with the jury, and the fact that some of his now-disavowed statements corroborated what other witnesses had testified to only underscored their credibility and his lack of it.[5]

Moreover, in his summation, defense counsel anticipated that the prosecution would argue that "the most damaging piece of evidence" was the defendant's statement to the police on September 23, 2006. During closing arguments, the prosecutor discussed the circumstances and details of the defendant's written statement. While the prosecutor argued that, like so much

---

**5.** Of course, the defendant's statements were inadmissible on the prosecution's direct case, but since he chose to testify, his statements were admissible for impeachment purposes (*see People v Carmona*, 82 NY2d 603, 611 [1993]).

of what the defendant said, his written statement of September 23, 2006 was a "mixture" of "truth and half lies," the prosecutor emphasized that "[t]here is truth in this." In asking the jury rhetorically, "[i]s this guilt of the felony murder . . . of the kidnapping in the first degree, of the tampering?", the prosecutor answered his own question, "[a]bsolutely, it is proof of guilt. It absolutely is. Consider it." Although the prosecutor stressed in summation that the defendant's statement was not the only evidence of guilt, it is clear that the prosecution considered it, if not the most damaging, at least a "damaging piece of evidence" (see People v Hardy, 4 NY3d 192, 199 [2005] [noting that the prosecutor's summation illustrated how important the improperly admitted evidence was to the prosecution, and its heavy reliance on that evidence created a reasonable possibility that its admission and subsequent exploitation by the prosecutor contributed to the verdict]; People v Richardson, 137 AD2d 105, 108 [1988] [in light of the prosecutor's extensive reference to the improperly admitted evidence in his summation, the error could not be considered harmless]; Wood v Ercole, 644 F3d 83 [2011] [concluding that the defendant's improperly admitted statement may have had a substantial and injurious effect or influence on the jury's verdict, considering the emphasis the prosecutor placed on it in summation]).

Where the prosecution specifically directs the jury to consider, as evidence of guilt, statements that otherwise should have been suppressed, and those statements support the testimony of other witnesses whose credibility was questionable, there exists a reasonable possibility that the jury followed the prosecution's urging and, thus, those statements might have contributed to the jury's decision to convict the defendant (see People v Goldstein, 6 NY3d 119, 129 [2005], cert denied 547 US 1159 [2006] [noting that, in deciding whether a constitutional error is harmless beyond a reasonable doubt, the court must consider not only the overall strength of the case against the defendant, but the importance to that case of the improperly admitted evidence]; People v Jones, 47 NY2d 528, 534 [1979] [noting, as significant, the fact that during summation the prosecutor argued that a confession that should have been suppressed corroborated the eyewitness accounts]).

As a final note, our dissenting colleague posits, summarily, that the evidence of the defendant's guilt, including the consistent testimony of five nonpolice witnesses who each connected the defendant to the commission of the crime, was overwhelm-

ing, and that there was no reasonable possibility that the error contributed to the defendant's conviction. In other words, the dissent essentially concludes that the evidence of guilt was overwhelming, and there is no reasonable possibility that the erroneous admission of the defendant's statements contributed to his conviction because the evidence was overwhelming. Harmless error analysis is not, however, circular in nature; rather, it requires "[t]wo discrete considerations" (*People v Crimmins*, 36 NY2d at 240). It is a consideration of not only the quantum and nature of the proof, but also the causal effect of the error on the jury's findings (*see People v Simmons*, 75 NY2d 738, 739 [1989]). It is these notions, of proof of guilt and prejudice to the defendant, that are the underpinnings of the harmless error doctrine (*see People v Daly*, 98 AD2d 803, 806 [1983], *affd* 64 NY2d 970 [1985]). And, in this case, despite the overwhelming proof of guilt, the error was not "unimportant and insignificant" (*Chapman v California*, 386 US 18, 22 [1967]).

### Remaining Contentions

The defendant's challenge to the legal sufficiency of the evidence supporting his convictions is unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Hawkins*, 11 NY3d 484, 492-494 [2008]; *People v Gray*, 86 NY2d 10, 19-20 [1995]; *People v Williams*, 38 AD3d 925, 925-926 [2007]). In any event, viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620, 621 [1983]), it was legally sufficient to establish the defendant's guilt of the crimes charged beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon the exercise of our factual review power (*see* CPL 470.15 [5]), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633, 643-644 [2006]).

In light of our determination, we need not address the defendant's remaining contentions.

The judgment is reversed, on the law, that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials is granted, and a new trial is ordered.

DILLON, J.P. (dissenting). I part company with the majority over the conclusion that any erroneous admission into evidence of the statements from September 22, 2006, and September 23, 2006, constituted error mandating a reversal of the defendant's conviction. In my view, the evidence of the defendant's guilt, including the consistent testimony of five nonpolice witnesses who each connected the defendant to the commission of the crime, was overwhelming, and there was no reasonable possibility that the error contributed to the defendant's conviction. While some of the witnesses had entered into cooperation agreements with the prosecution, this fact, of which the jury was aware, did not render their testimony incredible (*see People v Dennis*, 223 AD2d 599, 600 [1996]), especially when considered cumulatively (*see People v Thompson*, 75 AD3d 760, 763 [2010]). Accordingly, any error in admitting the aforesaid statements into evidence was harmless beyond a reasonable doubt (*see People v Paulman*, 5 NY3d 122, 134 [2005]; *People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *People v Zalevsky*, 82 AD3d 1136, 1138 [2011]; *People v Rhodes*, 49 AD3d 668, 669 [2008]).

FLORIO and LEVENTHAL, JJ., concur with CHAMBERS, J.; DILLON, J.P., dissents in a separate opinion.

Ordered that the judgment is reversed, on the law, that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials is granted, and a new trial is ordered.