People v Harris (2019 NY Slip Op 53943)





People v Harris


2019 NY Slip Op 53943


Decided on November 27, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 27, 2019

110587

[*1]The People of the State of New York, Respondent,
v
Michael Harris, Appellant.

Calendar Date: October 18, 2019

Before: Egan Jr., J.P., Lynch, Clark and Pritzker, JJ.


Hug Law, PLLC, Albany (Matthew C. Hug of counsel), for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Clark, J.
Appeal from a judgment of the Supreme Court (Hogan, J.), rendered January 11, 2018 in Schenectady County, upon a verdict convicting defendant of the crimes of arson in the second degree, burglary in the first degree, attempted assault in the second degree, falsely reporting an incident in the third degree (two counts) and harassment in the second degree.
In May 2017, based upon events that unfolded during the early morning hours of March 11, 2017, defendant was indicted on charges of arson in the second degree, burglary in the first degree, attempted assault in the second degree, falsely reporting an incident in the third degree (two counts) and assault in the third degree. Following a seven-day jury trial, defendant was found guilty of the first five counts of the indictment and, as to the sixth count of assault in the third degree, he was convicted of the lesser included offense of harassment in the second degree. He was subsequently sentenced to various concurrent prison terms, the longest of which was 15 years. Defendant appeals.
Initially, defendant failed to preserve his challenge to the legal sufficiency of the evidence supporting his convictions, inasmuch as his general trial motion for dismissal did not include the specific arguments he raises on appeal (see People v Gray, 86 NY2d 10, 19 [1995]; People v Chaneyfield, 157 AD3d 996, 996 [2018], lv denied 31 NY3d 1012 [2018]). However, because defendant also argues that his convictions are not supported by the weight of the evidence, we nevertheless must determine whether the People proved each element of the crimes beyond a reasonable doubt (see People v Henry, 166 AD3d 1289, 1289 [2018]; People v Harden, 134 AD3d 1160, 1160 [2015], lv denied 27 NY3d 1133 [2016]).
The trial evidence established that defendant and his wife were patrons at a bar in the City of Schenectady, Schenectady County during the early morning hours of March 11, 2017 and that they engaged in a series of heated arguments over when and if to go home, with defendant wanting to leave and the wife wanting to stay. The evidence revealed that the couple's dispute escalated to the point of requiring police intervention around 1:00 a.m. and that, after a period of de-escalation, the couple was ultimately permitted to reenter the bar. However, testimony and video footage from the bar demonstrated that the couple's dispute escalated once again more than an hour later, this time with defendant grabbing his wife's arm to try to forcibly remove her from the bar. As established by the evidence, several patrons intervened, resulting in defendant being pushed out of the bar and into the street, where a scuffle between defendant and other patrons ensued. Deferring to the jury's credibility determinations, we find that the foregoing evidence amply supports the conclusion that, through his conduct toward his wife at the bar, defendant committed harassment in the second degree (see Penal Law § 240.26; People v McMillon, 124 AD3d 922, 923 [2015], lv denied 25 NY3d 1204 [2015]).
With respect to the remaining charges, the evidence, including testimony given by the wife, established that, while defendant was engaged in the scuffle, the wife voluntarily left the bar with a male and a female and entered an apartment building across the street. As evidenced by testimony and two recorded 911 calls, defendant thereafter repeatedly reported to the police that his wife had been kidnapped. The evidence specifically showed that defendant called 911 at 3:54 a.m. to report the alleged kidnapping, that he visited the police station shortly after 4:00 a.m. to again report the alleged kidnapping and that he called 911 a second time at 4:59 a.m. to complain that his wife had not yet been found. A police officer who spoke with defendant at the station around 4:00 a.m. testified that defendant claimed that his wife had been abducted by a few men and taken to an apartment building across from the bar. Statements made by defendant to law enforcement after his apprehension suggested that he knew that his wife was in the apartment building voluntarily.
The evidence also showed that, shortly after 5:30 a.m., police officers and members of the fire department responded to a 911 call, made by a female, reporting that there was a fire in the apartment building across from the bar. As demonstrated by the evidence, the ensuing investigation revealed that the fire had been intentionally started with the aid of several 40-ounce Olde English malt liquor bottles that had been stuffed with paper towels doused in gasoline and placed on different levels of the apartment building's stairwell. The evidence revealed that, despite testing, there was no forensic evidence linking defendant to the arson scene. However, the People presented eyewitness testimony and other circumstantial evidence that pointed to defendant as having been the arsonist.
With respect to the eyewitness testimony, the male with whom the wife had left the bar (hereinafter referred to as the eyewitness) testified that he lived in the building and that, prior to the fire, he had heard a noise in the stairwell and observed defendant traverse the stairs from the first floor to the third floor several times. The eyewitness testified that he then heard "stuff falling . . . down the stairs" and saw that some debris was on fire. He stated that, after informing the wife and the other female of the fire, he observed the wife argue with defendant in the hallway and that, as the wife and the other female were trying to exit the building, he saw defendant squirt a liquid in their direction and attempt to light whatever was in front of them on fire. As established by police testimony, the eyewitness identified defendant as the man he had seen in the stairwell during a show-up identification procedure conducted less than an hour after the arson.[FN1] Testimony from the wife and the other female corroborated certain aspects of the eyewitness's account, including that there was a noise that prompted the eyewitness to look through a window to the hallway. However, neither the wife nor the female testified to having seen defendant in the stairwell.
As for the circumstantial evidence, the police discovered several empty Olde English malt liquor bottles at defendant's house, some of which bore the same expiration date as those found at the scene. In addition, testimony revealed that, shortly after the fire, police officers found defendant at his house hiding in a crawl space underneath the basement stairs. The wife testified that defendant hid after he saw police cars arrive at the house. She further stated that she observed defendant's leather jacket — a dry-clean only item — in the washing machine.
With respect to the two convictions of falsely reporting an incident in the third degree, we find that the evidence reasonably supports the jury's conclusion that defendant knew that his wife had voluntarily gone to the apartment and that he nonetheless falsely reported to a 911 dispatcher and to the police in person that his wife had been kidnapped. Although a different verdict would not have been unreasonable, we find that defendant's convictions on two counts of falsely reporting an incident in the third degree are supported by the weight of the credible evidence (see Penal Law § 240.50 [2], [3]; People v Hanifin, 77 AD3d 1181, 1182 [2010]).
As for the convictions of arson in the second degree, burglary in the first degree and attempted assault in the second degree, defendant brought out numerous inconsistencies and implausibilities in the eyewitness's account and effectively attacked the eyewitness's credibility with questions relating to his criminal history and potential motives for fabricating his testimony. Defendant also provided alternate explanations for most of the circumstantial evidence against him. Thus, in our view, it would not have been unreasonable for the jury to have acquitted defendant of the three charges relating to the apartment fire. However, viewing the evidence in a neutral light and deferring to the jury's credibility determinations, we are satisfied that defendant's convictions for arson in the second degree, burglary in the first degree and attempted assault in the second degree are supported by the weight of the evidence (see Penal Law §§ 150.15, 140.30 [3]; 120.05 [2]; 110.00; People v Baldwin, 173 AD3d 1748, 1748-1749 [2019], lv denied 34 NY3d 928 [2019]).
Although we find that the verdict was not against the weight of the evidence, we find that County Court (Sypniewski, J.) erred in denying defendant's motion to suppress a potentially incriminating statement that he made after invoking his constitutional right to counsel during a custodial interrogation and that Supreme Court erred in allowing certain video evidence of the potentially incriminating statement to be played for the jury without an adequate curative instruction. As a result of the undue prejudice flowing from these errors, the judgment of conviction must be reversed.
The right to counsel is a foundational and long "cherished principle" underlying our criminal justice system (People v Settles, 46 NY2d 154, 160-161 [1978]; see e.g. NY Const, art I, § 6). Thus, the right to counsel indelibly attaches as soon as "a defendant in custody unequivocally requests the assistance of counsel" (People v Glover, 87 NY2d 838, 839 [1995]; see People v Leflore, 154 AD3d 1164, 1167 [2017], lv denied 30 NY3d 1106 [2018]; People v Henry, 133 AD3d 1085, 1086 [2015]). "Whether a particular request is or is not unequivocal is a mixed question of law and fact that must be determined with reference to the circumstances surrounding the request[,] including the defendant's demeanor, manner of expression and the particular words found to have been used by the defendant" (People v Glover, 87 NY2d at 839; accord People v Henry, 133 AD3d at 1086; People v Jemmott, 116 AD3d 1244, 1246 [2014]).
At trial, the People admitted into evidence a DVD video recording of the first 50 minutes and 55 seconds of defendant's custodial interrogation.[FN2] A review of that video recording shows that defendant was advised of and acknowledged his Miranda rights in writing roughly 16 minutes into the custodial interrogation, after having made small talk with the detective questioning him. For the next 24 minutes, defendant openly and respectfully answered questions regarding the events that transpired earlier that morning, including whether he entered the apartment building, which he maintained that he did not. However, 40 minutes into the interview, defendant became increasingly quiet and less eager to engage in conversation. Indeed, the detective spoke for roughly 3½ minutes, with little to no contribution from defendant, and attempted to appeal to defendant "as a father." Defendant asked if he would be at the police station all weekend, to which the detective said, "no." The detective then asked defendant to tell him what had happened, but he was met with silence, prompting him to ask again. In response, defendant stated, "maybe I should get a lawyer. I completely understand what you're saying and I agree with you, but I don't want to f**k myself." In our view, defendant's marked change in expression and demeanor at this stage of the interrogation, together with his reference to an attorney and his clear statement that he did not want to incriminate himself, constituted an unequivocal request for counsel and an exercise of his right to remain silent (see People v Esposito, 68 NY2d 961, 962 [1986]; People v Roman, 175 AD3d 1198, 1199 [2019]; People v Bethea, 159 AD3d 710, 711 [2018], lv denied 31 NY3d 1115 [2018]; People v Slocum, 133 AD3d 972, 975-976 [2015], lv dismissed 29 NY3d 954 [2017]; People v Harris, 93 AD3d 58, 67-70 [2012], affd 20 NY3d 912 [2012]; People v Jones, 21 AD3d 429, 429 [2005], lv denied 6 NY3d 755 [2005]). Thus, the video recording of the interrogation should have been stopped at 48 minutes and 48 seconds, just before defendant unequivocally invoked his right to counsel. Accordingly, County Court should have granted defendant's motion to suppress all statements made thereafter.
The jury, however, was erroneously permitted to view the next two minutes and seven seconds of the video recording. During that portion of the video recording, the detective — seemingly understanding defendant's statement to be a request for an attorney — responded, "Okay, so you want a lawyer, is that what you're saying?" (emphasis added). Although defendant then gave an equivocal response, the right to counsel had already indelibly attached and could not be waived in the absence of counsel (see People v Esposito, 68 NY2d at 962; People v Roman, 175 AD3d at 1199; People v Zamiela, 84 AD2d 675, 675 [1981]). Defendant then followed up his statement with, "I mean, I don't want to f**k myself," once again indicating a desire to exercise his right against self-incrimination. The detective began to respond but was interrupted by defendant, who potentially incriminated himself by stating, "Yeah, I know. I f**ked up. I don't want to f**k myself worse." The detective pressed on, stating that he could not provide legal advice and that the decision belonged to defendant, but that it was an opportunity for defendant to explain his side of the story. Defendant then asked if his wife was still at the police station and, after the detective expressed uncertainty, defendant was silent for roughly 30 seconds. The video recording abruptly ended at that point because County Court had previously determined that the jury should not hear defendant's latter unequivocal request for counsel.
Even if we were to conclude that defendant's initial request for counsel was equivocal, we would nonetheless find that it was unduly prejudicial for Supreme Court to allow the People to play for the jury the last two minutes and seven seconds of the video recording, particularly without adequate curative instructions (see People v Johnson, 70 AD3d 1188, 1190-1191 [2010]; People v Murphy, 51 AD3d 1057, 1058 [2008], lv denied 11 NY3d 792 [2008]; see generally People v Lentini, 163 AD3d 1052, 1054 [2018]). The prejudice that flowed from the last two minutes and seven seconds of the video recording was not mitigated by an adequate curative instruction. The jury watched that portion of the video three times — once during the People's case-in-chief, once during the People's summation and once more at the jury's request during deliberations. Immediately following the first viewing, Supreme Court stated, in relevant part, "Members of the jury, I want to instruct you that with respect to any statement the [d]efendant made regarding an attorney[,] you are not to have any negative inference from that statement. There was a pretrial ruling with respect to this video and these portions of the video are ruled admissible under New York State law." In our view, the court's imprecise and confusing instruction — which failed to emphatically instruct the jury to disregard any reference to an attorney and to reiterate that defendant has an absolute right to remain silent — was insufficient to protect against the possibility that the jury might improperly infer consciousness of guilt from defendant's invocation of his right to counsel and to remain silent (see People v Lentini, 163 AD3d at 1054; People v Hunt, 18 AD3d 891, 892 [2005]). The potential for prejudice was further compounded by Supreme Court's vague reference to "a pretrial ruling," which may have had the unintended consequence of validating the references to an attorney by noting that the matter was the subject of a pretrial hearing. Moreover, the jury's second and third viewings were unaccompanied by any curative instruction whatsoever.
Errors of constitutional magnitude, such as the ones made in this case, may nonetheless be harmless if the evidence of guilt, without consideration of the erroneously admitted evidence, is overwhelming and "there is no reasonable possibility that the error might have contributed to [the] defendant's conviction" (People v Crimmins, 36 NY2d 230, 237 [1975]; see People v Harris, 93 AD3d 58, 70 [2012], affd 20 NY3d 912 [2012]). The evidence against defendant was not overwhelming here. Aside from the testimony given by the eyewitness, whose credibility was damaged on cross-examination, the case against defendant was largely circumstantial. As evidenced by two jury notes, the jury struggled to reach a guilty verdict on the top charges of the indictment — arson in the second degree, burglary in the first degree and attempted assault in the second degree — and only reached consensus after receiving an Allen charge. The erroneously admitted portion of the video recording was clearly considered by the jury during deliberations. Indeed, the jury specifically requested and watched the last 10 minutes of the video recording in between its submission of two jury notes indicating disagreement on the first three charges of the indictment. Under all of the circumstances, including the absence of adequate curative instructions, we conclude that there is a likelihood that County Court's and Supreme Court's errors contributed to defendant's conviction (see People v Kennard, 134 AD3d 1519, 1521-1522 [2015]; People v Harris, 93 AD3d at 70; People v Knowles, 42 AD3d 662, 665 [2007]; compare People v McLean, 243 AD2d 756, 756-757 [1997], lv denied 91 NY2d 928 [1998]). Accordingly, the judgment of conviction must be reversed, and the matter remitted for further proceedings.
Given our determination, we need not address defendant's remaining contention that the sentence imposed upon him was harsh and excessive.
Egan Jr., J.P., Lynch and Pritzker, JJ., concur.
ORDERED that the judgment is reversed, on the law, motion to suppress statements made after defendant's right to counsel attached granted and matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision.



Footnotes

Footnote 1: We reject defendant's contention that the pretrial identification — which occurred almost immediately after defendant's apprehension and in a location roughly one tenth of a mile from the crime scene — should have been suppressed as the result of an unreasonable or unduly suggestive show-up procedure (see People v Mathis, 60 AD3d 1144, 1145-1146 [2009], lv denied 12 NY3d 927 [2009]; People v Brown, 46 AD3d 1128, 1129-1130 [2007]).

Footnote 2: The remainder of the recorded interrogation was precluded pursuant to a pretrial suppression hearing order issued by County Court.