[972 NYS2d 642]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN
GONZALES, Appellant.

Second Department, October 2, 2013

APPEARANCES OF COUNSEL

*Enrico DeMarco*, New York City, for appellant.

*Richard A. Brown, District Attorney*, Kew Gardens (*John M. Castellano, Johnnette Traill* and *Suzanne H. Sullivan* of counsel), for respondent.

**OPINION OF THE COURT**

BALKIN, J.

The police arrested the defendant inside his home. They did not have a warrant, the defendant had not consented to their entry, and the defendant had remained inside his home since before the police arrived. The straightforward issue on this appeal is whether the Supreme Court erred in denying that branch of the defendant's omnibus motion which was to suppress the statement he made in his home after he was arrested. We conclude that precedent from the United States Supreme Court and the New York Court of Appeals requires that we reverse the judgment and remit the matter to the Supreme Court, Queens County, for a new trial.

According to the testimony at the defendant's suppression hearing, the police received a call regarding a "possible sexual assault in progress" at a specified address. They went to that address and saw the complainant waiting for them outside. After she told them that her cousin's boyfriend had assaulted her in a basement apartment at that address, the police, accompanied by the complainant, went to the door of that apartment and knocked. When the defendant opened the door, the police asked the complainant if he was the person who had assaulted her, and she said yes. The defendant, who had never left the apartment, even partially, tried to close the door, but the police pushed their way inside and handcuffed him. Minutes later, still inside the apartment, the defendant made an inculpatory statement.

After the defendant was indicted, he moved to suppress his statement, and the Supreme Court held a suppression hearing. At the conclusion of that hearing, the court ruled, and reasoned, as follows:

> "Here's where I will hold this is not a *Payton* violation. The door opened. [The defendant] was visible in the doorway, the open doorway of the apartment, and identified almost instantaneously by [the complainant] as the alleged perpetrator of the criminal act.
>
> "Okay. Once this happened [the defendant] attempted to close the door unsuccessfully. It's akin to the hot pursuit exception to the *Payton* rule. A suspect fleeing the police cannot go into the home in order to avoid apprehension. That's what happened here in my opinion. That's why it's not a *Payton* violation.
>
> "You had probable cause when the complainant said, 'that's him.' And, basically, he was—[the defendant] was visible to the officers by virtue of the open door. And the officers had the right to go in without a warrant to effect his arrest based upon the hot pursuit. He started closing the door. The officers could not allow that to happen.
>
> "If you want to go under [the] [r]ubric [of] exigency, once identified there was flight, the officers had a right to pursue. That created exigency at that moment."\*

The court also held that the police had not subjected the defendant to custodial interrogation. The court, therefore, denied that branch of the defendant's omnibus motion which was to suppress his statement.

The branch of the defendant's omnibus motion which was to suppress his statement should have been granted.

In *Payton v New York* (445 US 573 [1980]), the United States Supreme Court announced a clear and easily applied rule with

---

\* Inasmuch as the hearing court did not ground its ruling on any other finding of "exigency," such as the presence of a baby or the need to preserve evidence, those issues did not "adversely affect[ ] the appellant" (CPL 470.15 [1]). Consequently, this Court is jurisdictionally barred from considering them on the defendant's appeal (*see* CPL 470.15 [1]; *People v Concepcion*, 17 NY3d 192, 195 [2011]; *People v LaFontaine*, 92 NY2d 470, 473-474 [1998]; *People v Harris*, 93 AD3d 58, 66 [2012], *affd* 20 NY3d 912 [2012]).

respect to warrantless arrests in the home: "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant" (445 US at 590). The rule under the New York Constitution is the same (*see* NY Const, art I, § 12; *People v Levan*, 62 NY2d 139, 144 [1984]). *Payton* and *Levan* require suppression of the defendant's statement under the clear, undisputed facts of this case.

Certainly, if the defendant's encounter with the police had begun outside his home, or even on the threshold of it, the defendant could not have avoided arrest by fleeing into his home (*see United States v Santana*, 427 US 38, 43 [1976]). But, contrary to the hearing court's characterization, the defendant's attempt to close his door was not "akin" to "fleeing"; he had never left the constitutionally protected interior of his home in the first place, even partially, so he did not flee "into" his home (*see People v Levan*, 62 NY2d at 144-145; *cf. People v Reynoso*, 2 NY3d 820, 821 [2004], *affg* 309 AD2d 769, 770 [2003]).

Our dissenting colleagues and the People rely on *United States v Santana* for the proposition that the doorway of a home is a "public place" for the purposes of a Fourth Amendment analysis (427 US at 42). The defendant in *Santana* was not inside her home when the police arrived and announced their presence; she "was standing directly in the doorway—one step forward would have put her outside, one step backward would have put her in the vestibule of her residence" (*id.* at 40 n 1). Santana retreated from the threshold into her home and the police followed and arrested her inside. The United States Supreme Court held, first, that Santana, by standing in the "threshold," was in a public place for purposes of the Fourth Amendment and, second, that she could not avoid a warrantless arrest by retreating into her house after the police arrived (*id.* at 42). In other words, Santana could not escape a warrantless arrest by traveling from the constitutionally public space of the threshold to the constitutionally private space of the interior of her home. The undisputed facts here differ from the facts in *Santana,* and the differences are legally significant in light of *Payton,* which was decided after *Santana.*

First, it is clear that, unlike the defendant in *Santana,* the defendant here was always in the interior of his home. This distinction is determinative. Four years after deciding *Santana,* the United States Supreme Court decided *Payton* and its companion case, *Riddick v New York*. In *Payton* and *Riddick,*

the Court adopted a more restrictive rule with respect to warrantless arrests than might have been supported under the broad language the Court had employed in *Santana.* Specifically, when the Court held in *Santana* that the defendant, who had been standing in the threshold of her home, was in a " 'public' place" (427 US at 42), it reasoned that she was "not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house" (*id.*). Before *Payton* and *Riddick* were decided, that reasoning (except for "touch") might reasonably have been extended to justify a warrantless arrest of a person, like the defendant here, seen standing near an open door but entirely within his or her home. But, in *Payton* and *Riddick,* the Court drew a line: however visible or audible a person may be inside his or her home, the police are not permitted to cross the "threshold" of that home without a warrant, in the absence of exigent circumstances (*Payton v New York,* 445 US at 590). In *Riddick,* for example, the police knocked on the door to Riddick's house, and Riddick's son opened it. Through the open door, the police saw Riddick sitting on his bed. They entered his home and arrested him. The Court held that because Riddick was at all times inside his home, the police could not enter without a warrant, despite the fact that they could see him through the open door (*id.* at 578, 603).

In *People v Levan* (62 NY2d 139 [1984]), our Court of Appeals recognized the limit *Payton* and *Riddick* had placed on the broad *Santana* language. In *Levan,* a neighbor knocked on the defendant's door and, when the defendant opened it, the police, who were waiting nearby, rushed inside and arrested the defendant. The Court of Appeals expressly rejected the People's reliance on *Santana.* It held that *Payton* required suppression and that *Santana* was inapposite: *"Santana* furnishes no support for the actions of the police in this case, given the Supreme Court's pronouncement in *Payton* that 'the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant' " (62 NY2d at 145, quoting *Payton,* 445 US at 590). Put differently, even though the defendant in *Levan,* who was entirely inside his apartment, may have been "not merely visible to the public but . . . as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house" (427 US at 42), the Fourth Amendment protected him from a warrantless arrest. Our col-

leagues criticize the "literal interpretation of the term 'threshold' " (*infra* at 155), but that literal interpretation is required by the United States Constitution. As the United States Supreme Court said in *Payton*, "[t]he Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home" (445 US at 589).

Our dissenting colleagues contend that in *People v Reynoso* (2 NY3d at 821), the Court of Appeals upheld an arrest "in the doorway" of a defendant's home (*infra* at 154), but that case only highlights the constitutional significance of the literal meaning of "threshold." In *Reynoso*, the police testified that the defendant had voluntarily left his home upon their request that he come outside (309 AD2d 769, 770). The defendant, by contrast, contended that, after he "put [his] head[ ] outside the door jamb to see who was calling at this late hour" (309 AD2d at 771 [McGinity, J., dissenting]), the police reached in and pulled him out. Thus, in both versions of what had transpired, the defendant had voluntarily emerged, at least in part, from his home. By doing so, he surrendered the enhanced constitutional protection of the home. In this case, by contrast, the undisputed evidence is that the defendant did not leave his home at all. Accordingly, *Reynoso* did not blur the clear constitutional demarcation, or "firm line" (*Payton v New York*, 445 US at 590), that the Supreme Court and the Court of Appeals recognized in *Payton* and *Levan*.

Our dissenting colleagues would replace that firm line with an inquiry into a suspect's "intentions and expectations" (*infra* at 156). That amorphous inquiry would depend on how far the defendant opened the door, how far into the home the police intruded without a warrant, and how long the police have had probable cause to arrest the defendant. Even aside from the fact that the approach proposed by our dissenting colleagues runs afoul of the constitutional significance accorded the physical boundaries of the home, it cannot be practically applied. For example, how far does the door have to be opened to constitute a surrender of Fourth Amendment protection? How far into the home may the police intrude? As far as they can see? As far as they can reach? And, how long after the police obtain probable cause may they enter the home without a warrant? The inquiry propounded by our dissenting colleagues is not practical for anyone, because it provides guidance neither to the police, who

seek to enforce the law, nor to citizens, who have the "right . . . to be secure in their . . . houses . . . against unreasonable searches and seizures" (US Const Amend IV).

The rule announced in *Payton* and applied in *Levan* is clear and easily understood: a person enjoys enhanced constitutional protection from a warrantless arrest in the interior of the home, but not on the threshold itself or the exterior. As the United States Supreme Court recently observed, "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy" (*Florida v Jardines*, 569 US —, —, 133 S Ct 1409, 1417 [2013]). The defendants in *Riddick* and *Levan,* and the defendant here, were inside their homes and thus entitled to that enhanced constitutional protection; the defendant in *Santana,* who was merely standing in the threshold, was not.

In sum, because the police arrested the defendant in his home, without a warrant and in the absence of exigent circumstances, the arrest violated the Fourth Amendment to the United States Constitution and article I, § 12 of the New York Constitution. That branch of the defendant's omnibus motion which was to suppress his resulting statement should therefore have been granted. Also, inasmuch as the evidence was not overwhelming, the error could not be harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d 230, 237 [1975]), so the judgment must be reversed and a new trial ordered.

In light of our determination, we need not address the defendant's remaining contentions.

Accordingly, the judgment is reversed, on the law, that branch of the defendant's omnibus motion which was to suppress his statement to law enforcement officials is granted, and a new trial is ordered.

ANGIOLILLO, J.P. (dissenting). In our view, the police officers acted lawfully at all stages of their encounter with the defendant. We would hold that the officers properly investigated this matter and appropriately followed through with an immediate arrest inside the doorway of the defendant's apartment, without infringing upon his constitutional rights. Therefore, we respectfully dissent.

At the suppression hearing, the officers testified that they received a radio run of a possible sexual assault in progress and, upon their arrival at the residence, spoke with the complainant, who was standing outside on the sidewalk and appeared frazzled, upset, and shaken. The complainant told the officers

that she had come to the basement apartment of the residence intending to visit her female cousin, who had recently had a baby. The defendant, who was the baby's father, was home alone with the infant. He invited the complainant inside and subjected the complainant to certain acts of sexual abuse. The complainant indicated that the defendant was still inside the apartment with the baby, and led the officers to the entrance of the apartment. One of the officers knocked, and the defendant opened the door; in response to an officer's question, the complainant identified the defendant as her assailant. At that point, the defendant attempted to shut the door, but one of the officers prevented the defendant from closing it, pushed his way in, and handcuffed the defendant a few feet inside the apartment.

Under these circumstances, the officers acted properly and did not violate the defendant's constitutional rights when they approached and knocked on the door of the defendant's private residence in order to investigate the complaint (*see People v Kozlowski*, 69 NY2d 761, 762-763 [1987]). At that point, the defendant voluntarily opened his door, exposing himself to the view of persons outside of his residence. It is undisputed that, upon the complainant's identification of the defendant, the officers had probable cause to arrest him.

Had the defendant not attempted to close the door, the officers properly and constitutionally could have effected an immediate arrest of the defendant in his doorway. Several cases decided after *Payton v New York* (445 US 573 [1980]) have held that an arrest "at the doorway" or "in the doorway" to a private residence is lawful and constitutional (*see People v Reynoso*, 2 NY3d 820, 821 [2004] ["the arrest occurred either after defendant exited his home voluntarily or while he stood in his doorway"], *affg* 309 AD2d 769, 770 [2003] ["upon being requested to come outside, the defendant either voluntarily exited his house, or stood behind his mother, in the front doorway, and stuck his head out of the door" and "either version supports the conclusion that the arrest was legal"]; *People v Ashcroft*, 33 AD3d 429, 429 [2006], *lv denied* 8 NY3d 843 [2007], *cert denied* 552 US 829 [2007] [the defendant "voluntarily opened his door" and the police "reached in and pulled him out as he stood in close proximity to his doorway"]; *People v Burke*, 24 AD3d 129, 130 [2005] [the defendant was arrested "in the doorway of his apartment"]; *People v Francis*, 209 AD2d 539, 539 [1994] [the defendant's arrest "at the doorway of his apartment did not violate *Payton*"]; *People v Rosario*, 179 AD2d 442, 442 [1992] ["arrest at the doorway of his apartment did

not implicate *Payton* rights"]; *People v Anderson*, 146 AD2d 638, 639 [1989] [upon being requested to come outside, the defendant "either voluntarily exited the building or stood in the front doorway" and "either version supports the conclusion that the arrest was legal"]; *People v Nonni*, 141 AD2d 862, 863 [1988] [the officer announced that the defendant was under arrest when, in response to the officer's knock, the defendant opened the door and "stood in the doorway"]). The express rationale for these holdings is that the defendant, by voluntarily placing himself in the open doorway and exposing himself to public view, has no legitimate expectation of privacy protected by the Fourth Amendment (*see People v Ashcroft*, 33 AD3d at 429; *People v Reynoso*, 309 AD2d at 770; *People v Francis*, 209 AD2d at 540; *People v Anderson*, 146 AD2d at 640; *People v Nonni*, 141 AD2d at 863; *see generally United States v Santana*, 427 US 38, 40-42 [1976]).

We would hold that, since the officers were authorized to arrest the defendant at his doorway shortly after he opened his door, the defendant was not entitled to thwart a lawful arrest by closing the door and retreating into the constitutionally protected area of his home (*see United States v Santana*, 427 US at 42; *People v Wheatley*, 55 AD3d 947, 948 [2008]; *People v Mitchell*, 290 AD2d 518, 519 [2002]; *People v Harris*, 193 AD2d 757, 757 [1993]; *People v Thomas*, 164 AD2d 874, 874-875 [1990]).

Our colleagues in the majority note that, "if the defendant's encounter with the police had begun outside his home, or even on the threshold of it, the defendant could not have avoided arrest by fleeing into his home," but conclude that the arrest was unlawful here because the defendant "never left the constitutionally protected interior of his home" (*supra* at 150). This approach rests on a literal interpretation of the term "threshold" which defines the constitutionally protected area precisely according to the line within the doorframe which separates the outside from the inside. We find this approach neither warranted by the constitutional rationale underlying *Santana*, nor at all practical as a guideline to inform law enforcement officers in their conduct.

*Santana* was premised upon the rationale that " '[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection' " (427 US at 42, quoting *Katz v United States*, 389 US 347, 351 [1967]). Apart from the footnote in *Santana* that described the defendant's exact position in the

doorway (427 US at 40 n 1 ["one step forward would have put her outside, one step backward would have put her in the vestibule of her residence"]), the cases which have followed the rationale of *Santana* do not rest on such a precise, intractable distinction. Whether the reported decisions in these cases describe the defendant's position as being "in the doorway," "at the doorway," or "in close proximity to the doorway," it is clear in every such case that the defendants' behavior evinced an intentional exposure to public view by opening the door or standing in close proximity to the open doorway. By contrast, where a defendant's behavior communicates that he or she does not intend to be exposed to public view, a warrantless arrest inside the defendant's home is unlawful (*see People v Robert*, 156 AD2d 730, 730 [1989] [the defendant "opened the door a 'crack' in order to peer out to see who was there" and "the police pushed their way in past the door"]).

As a practical matter, a resident inside his or her abode who opens the door inward will often be standing several inches within the residence. For example, in *Reynoso*, the Court of Appeals upheld the arrest as constitutional (2 NY3d at 821) despite evidence that the defendant's body was not on the threshold but inside the home (309 AD2d at 770 ["the defendant . . . stood behind his mother, in the front doorway, and stuck his head out of the door"]; 309 AD2d at 771 [McGinity, J., dissenting] ["While standing within their home, both the mother and son, the defendant, put their heads outside the door jamb to see who was calling at this late hour"]). We would not rest the outcome of a *Payton* challenge on such a measurement. A police officer investigating a complaint of a recently committed crime will not be focusing on the suspect's precise position in the open doorway when making the necessary judgment call as to the suspect's constitutional rights, and the cases upholding arrests "in" or "at the doorway" have not been premised upon such evidence. Instead, distinctions based upon behavior communicate a suspect's intentions and expectations far more readily than distinctions based upon inches or feet inside or outside a doorway. We do not agree with our colleagues in the majority that the discernment of a suspect's intentions and expectations presents an impractical or unworkable guideline. Law enforcement officers are routinely called upon in every stop, frisk, and arrest situation to make judgments based upon a suspect's behavior, and Fourth Amendment protections are premised upon whether the individual has a legitimate expectation of privacy in the situation (*see United States v Santana*, 427 US at 42).

Further, in our view, *People v Levan* (62 NY2d 139 [1984]) and *Riddick v New York,* which is the companion case to *Payton* (445 US 573 [1980]), do not mandate the approach taken by the majority. In both *Riddick* and *Levan,* the police had probable cause to arrest the defendants far in advance of their visits to the defendants' homes, yet they failed to obtain arrest warrants. In *Riddick,* the defendant's behavior did not evince an intent to expose himself to public view; he was fully inside his home, sitting in bed covered by a sheet, when his son opened the door to the police, who were able to see him from outside the house (*Payton v New York*, 445 US at 578). The holding in *Levan* was based in part on the lack of exigent circumstances justifying a forcible entry into the suspect's home. The police arranged a stakeout at the defendant's apartment building, and when he voluntarily opened the door in response to a neighbor's knock, the police, "with guns drawn, bypassed the woman, entered the apartment and arrested defendant inside" (62 NY2d at 143). The Court distinguished *Santana* (427 US at 38) as a "hot pursuit" case in which the police first observed the defendant "while outside her home, holding what they believed to be destructible evidence," giving rise to exigent circumstances justifying their following her into her home (62 NY2d at 145). By contrast, in *Levan* "[t]here was an affirmed finding that no exigent circumstances existed" and "the police themselves cannot by their own conduct create an appearance of exigency" (*id.* at 146). Moreover, subsequent to *Levan,* the Court of Appeals rejected a *Payton* challenge to an arrest that "occurred either after defendant exited his home voluntarily or while he stood in his doorway," determining either circumstance to be lawful (*People v Reynoso*, 2 NY3d at 821). The situation in *Reynoso* is closer to that in the instant case than the situation in *Levan.*

Accordingly, we would agree with the trial court that the defendant's arrest was lawful and does not provide a basis for suppressing his statements to law enforcement officials. Further, we would affirm the conviction, as we find the defendant's remaining contentions to be without merit.

LOTT and AUSTIN, JJ., concur with BALKIN, J.; ANGIOLILLO, J.P., dissents in an opinion in which ROMAN, J., concurs.

Ordered that the judgment is reversed, on the law, that branch of the defendant's motion which was to suppress his statement to law enforcement officials is granted, and a new trial is ordered.