*59 OPINION OF THE COURT
Miller, J.
Because we conclude that the defendant was deprived of his constitutional right to present a defense when the Supreme Court precluded him from offering evidence that the victim in this case, throughout the course of the one-year period following the crime, repeatedly and consistently identified another individual as the perpetrator, we reverse.
The victim in this case, an 81-year-old woman, was repeatedly struck over the head with a telephone by an intruder who entered her home on the night of July 24, 2006. Although the victim identified a man who lived down the street from her as the perpetrator, the police focused their investigation on her next-door neighbor — the defendant in this case. The defendant was eventually charged with burglary in the first degree and related offenses.
At the jury trial, the People presented testimony from the victim’s neighbors, which indicated that the victim emerged from her home at about 10:45 p.m. on the night in question, bleeding heavily from her head and asking for someone to call the police. When asked “who did this to you?,” the victim responded, “my neighbor’s husband.” The victim’s clothing was soaked with blood. The defendant and three other individuals who rented apartments in the building next door to the victim’s residence came outside to assist the victim. The defendant went back inside his building and brought the victim a glass of water and a wet rag, which he handed to her. Although the neighbors testified that they did not notice the defendant come into contact with the victim, one of the defendant’s neighbors later testified that she observed spots on the back of the defendant’s shirt and ear lobe which she thought could have been blood. After a neighbor called the 911 emergency telephone number, the victim sat on the stoop and told one of the neighbors, “[m]y neighbor’s husband did this to me.” Other neighbors similarly testified that the victim kept repeating the phrase “my neighbor’s husband.”
When the police arrived about 10 minutes later, five or six people were congregated on the stoop. A police officer testified at trial that the victim told him that she was awakened from her sleep by a man who attempted to smother her with a pillow and repeatedly hit her over the head with a telephone. The police officer testified that the victim did not identify the defendant as the perpetrator. The victim was eventually transported to a hospital by ambulance.
*60 The victim was interviewed at the hospital the next morning by the detective assigned to the case. The detective testified that the victim identified the man who attacked her as one of her neighbors, named Inderjeet Uppal, who lived on her block. The detective testified that the victim told him that Uppal struck her in the face with her telephone while she was asleep and attempted to suffocate her with her pillow. The detective testified that the victim told him that Uppal attempted to kill her because he had “some type of financial motive.”
The detective testified that he interviewed Uppal later that day. Uppal testified that he was “very close” with the victim, that his wife had a key to the victim’s house, and that the victim told him that she had named him in her will about one year before the attack. Uppal testified that the victim spoke to him about her will “all the time,” and his wife stated that the victim had informed her that they would inherit the victim’s house in the event of the victim’s death. Uppal claimed that he was at home with his wife at the time of the attack. The detective testified that he reviewed surveillance footage depicting “approximately where Mr. Uppal lived” in the hour before the attack, but that the video had “no value” and did not show anyone entering or leaving the Uppals’ residence. Although he lived only two or three houses away from the victim’s home, Uppal did not come outside on the night of the attack because he did not observe any flashing lights or hear any sirens from the police vehicles or ambulances that responded. During his interview with Uppal, the detective asked him to take off his shirt to see whether his body bore any injuries consistent with a struggle. The detective observed red marks on Uppal’s body, and there were scratches on his arms. Uppal claimed that he sustained these injuries during the course of his employment.
The detective took photographs of Uppal and photographs of the defendant; the defendant did not have any marks on his body. The detective considered the defendant a suspect after an unrecorded interview with an individual who was not identified at the trial. The detective went to the defendant’s apartment and was let inside by the defendant, whom the detective described as “very cooperative.” The detective testified that he observed spots on the back of the defendant’s shirt and a small smudge on the outside of the kitchen door which the detective thought looked like blood. However, the detective did not take any pictures of the smudge, nor was it ever tested.
The detective returned to the hospital in the afternoon of the day after the attack, and showed the victim a photograph of Up- *61 pal and a photograph of the defendant. The detective testified that the victim identified Uppal as the attacker, stating “[tjhat’s the son of a bitch that tried to kill me.” The detective testified that the victim did not identify the defendant as the attacker. The detective was permitted to testify that the victim was “mistaken” when she identified Uppal as the perpetrator in the days after the attack.
Uppal was later arrested, but the detective testified that, in his opinion, Uppal was not the perpetrator, and the charges were later dropped. The defendant was subsequently arrested after one of the three stains on the back of the shirt he was wearing on the night of the incident tested consistent with the victim’s DNA. The other two spots, although tested, were not found to be consistent with the victim’s DNA. While in custody, the defendant made a statement that he had broken into the victim’s home to steal some food, and that he had been confronted by the victim and pushed her to the ground before fleeing. The victim, whom the detective described as a former employee of the National Aeronautics and Space Administration who maintained her own home and garden, who did “all her own woodwork,” and who “paint[ed] her house,” never identified the defendant or otherwise accused him of being the perpetrator.
Although she was called by the People and testified at the grand jury proceedings, the victim was not available to testify at the trial due to her medical condition. In this regard, the People were permitted to adduce testimony from a doctor, deemed an expert in geriatric medicine, who opined that the victim suffered from “full dementia” and that she was incapable of testifying at the defendant’s trial.
The People’s expert was also permitted to state his opinion that the victim was suffering from dementia or delirium at the time she was hospitalized in the days after the attack. This opinion was reached on the basis of the “limited information” contained in the victim’s hospital records. The People’s expert nevertheless conceded that the hospital records indicated that the victim was not ordered to undergo a psychological consultation, which would have been the normal procedure if the medical personnel who treated her had observed any indication of confusion, dementia, or delirium. The hospital records showed that the victim was alert and oriented to the time, to her location, and to her person (commonly referred to as oriented “times three”), a finding inconsistent with dementia and confusion. *62 The victim was discharged without restrictions and in stable condition two days after the attack.
However, the People’s expert testified that it was possible that the victim’s condition “fluctuated” and that she later became “much better.” The People’s expert further testified that, based on his review of the victim’s medical records from the summer and fall of 2007, about one year after the attack, the victim was suffering dementia at that time. He opined that, at the time he began treating the victim in February 2008, more than 172 years after the attack, she suffered from “full dementia.” The People’s expert stated that an individual with full dementia had lost his or her cognitive functions, had no past or recent memories, did not know of his or her surroundings, and was totally confused.
After the close of the People’s case, the defendant sought to introduce evidence that the victim had recorded the attack in her personal diary two days after the incident, and that she identified Uppal as the perpetrator and described his beard and other characteristics in even greater detail than provided in the detective’s account of her hospital identification. The defendant also sought to introduce evidence that the victim had provided an identical account to the director of her senior center in the month after the incident, and that she had executed and sworn to an affidavit identifying Uppal as her assailant about one year later. Finally, the defendant sought to introduce evidence that the victim had subsequently removed Uppal from her will, and that the People had called the victim to testify before the grand jury but had specifically refused to ask her whether she could identify the perpetrator of the attack.
The People objected to the admission of this evidence, and the Supreme Court ultimately precluded the defendant from presenting it to the jury. The court excluded the victim’s diary entry and her affidavit, based on its conclusion that defense counsel should have utilized a procedure pursuant to CPL 660.20, which would have allowed him to conduct a direct examination of the victim prior to trial. The court further precluded evidence of the statement to the senior center director and the alteration of the victim’s will on the ground that the defendant already had placed the fact that the victim had identified Uppal as the perpetrator “in front of the jury,” and because the victim’s state of mind on the dates subsequent to the attack was “largely irrelevant.” The court stated that the evidence of the victim’s state of mind would “generate more heat than *63 light,” and it refused to permit such evidence “as a matter of discretion.”
In light of the court’s ruling, the defendant did not present any evidence on his own behalf. The jury returned a verdict finding him guilty of burglary in the first degree. During the sentencing proceedings, the defendant repeatedly maintained his innocence. The Supreme Court, at sentencing, stated that the District Attorney’s office “could have” charged the defendant with a “hate crime” given the age of the victim, but that the charge did not matter since it was going to impose the same sentence it would have imposed had the crime been charged as a hate crime. The defendant — who was 24 years old, had no history of violent crime, and had never been convicted of a felony— was sentenced to a determinate term of imprisonment of 19 years.
We conclude that the Supreme Court deprived the defendant of his constitutional right to present a defense when it precluded him from presenting the evidence he proffered to establish that the victim repeatedly and consistently identified Uppal as the perpetrator of the crime after she was discharged from the hospital, both in the days following the attack and throughout the course of the year which followed.
We first address the issue of whether the Supreme Court properly precluded evidence that the victim identified Uppal as her attacker in an entry she wrote in her personal diary two days after the incident, and in an affidavit executed approximately one year later. The Supreme Court stated that this determination was based on its conclusion that defense counsel should have utilized a procedure pursuant to CPL 660.20, which would have allowed him to conduct a direct examination of the victim prior to trial.
CPL 660.10 provides that, under certain circumstances, “a criminal court may, upon application of either the people or a defendant, order that a witness or prospective witness in the action be examined conditionally under oath in order that such testimony may be received into evidence at subsequent proceedings in or related to the action.” CPL article 660 “provides the mechanism for preserving the testimony of a prospective material witness where there is reasonable cause to believe the witness will not be available for trial because he or she . . . will be too physically ill or incapacitated to attend at trial” (Peter Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 660.10).
*64 Nothing in CPL article 660 requires a party to move for a conditional examination, and that article does not provide that a failure to utilize that procedure, assuming it is available, establishes an independent legal basis upon which to exclude evidence obtained through alternative means (see CPL art 660). Accordingly, the Supreme Court erred in precluding the defendant from presenting evidence of the victim’s diary entry and her affidavit on the ground that the defendant failed to seek permission to utilize the procedure authorized under CPL article 660 (compare People v Kenny, 283 AD2d 950 [2001]; People v Mensche, 276 AD2d 834 [2000]).
The Supreme Court, in precluding evidence of the victim’s statement to the senior center director, in which she identified Uppal as her assailant, as well as the alteration of her will, stated that it did so “as a matter of discretion.” “Before permitting evidence that another individual committed the crime for which a defendant is on trial, the court is required to determine if the evidence is relevant and probative of a fact at issue in the case, and further that it is not based upon suspicion or surmise” (People v Oxley, 64 AD3d 1078, 1081 [2009]; see People v Primo, 96 NY2d 351, 356-357 [2001]). “Then, the court must balance the probative value of the evidence against the prejudicial effect to the People and may, in an exercise of its discretion, exclude relevant evidence that will cause undue prejudice, delay the trial, or confuse or mislead the jury” (People v Oxley, 64 AD3d at 1081; see People v Primo, 96 NY2d at 356-357). Although a trial court has “broad discretion to keep the proceedings within manageable limits and to curtail exploration of collateral matters” (People v Hudy, 73 NY2d 40, 56 [1988]; see Holmes v South Carolina, 547 US 319 [2006]), “the trial court’s discretion in this area is circumscribed by the defendant’s constitutional rights to present a defense and confront his accusers” (People v Hudy, 73 NY2d at 57; see Chambers v Mississippi, 410 US 284 [1973]; People v Robinson, 89 NY2d 648 [1997]; People v James, 242 AD2d 389 [1997]).
Here, the evidence that the victim identified Uppal as the perpetrator was exculpatory evidence that was directly relevant to the fundamental issue in this case — the identity of the attacker. Furthermore, such evidence of third-party culpability, coming from the victim of the crime herself, cannot be properly characterized as “rest[ing] on mere suspicion or surmise” (People v Primo, 96 NY2d at 357; cf. Greenfield v People, 85 NY 75, 89 [1881]).
*65 Indeed, the Supreme Court undoubtably came to the same conclusion inasmuch as it permitted the People to elicit such evidence on their direct case. The Supreme Court, however, in effect, concluded that the evidence proffered by the defendant was repetitive and that its admission would, therefore, cause undue delay in light of the fact that the evidence presented by the People had already alerted the jury to the fact that the victim had identified Uppal as the perpetrator.
The People’s carefully controlled and abbreviated presentation of the defense theory of this case did not render the evidence proffered by the defendant repetitive, and the People’s version of the defendant’s theory did not serve to satisfy his right to present his own defense. The Supreme Court’s rulings ceded control of the defense to the prosecutor, who was effectively permitted to fulfill both roles of the adversarial process — the prosecution and the defense. In this way, the defense theory was framed in a manner befitting the prosecutor’s purpose. The prosecutor was permitted to call Uppal as a witness in an effort to prove that man’s innocence, while the defendant was deprived of his own right to establish his own innocence at his own trial.
The defendant was deprived of his right to present to the jury the fact that the victim repeatedly and consistently identified Uppal as her attacker throughout the course of the year following the attack. The “sheer number” of times that the victim identified Uppal, and the fact that she named him as the perpetrator in a variety of settings and to a variety of individuals, provided “additional corroboration” for each identification (Chambers v Mississippi, 410 US at 300; see People v Smith, 195 AD2d 112, 123 [1994]). Furthermore, the description of the perpetrator given by the victim in the evidence proffered by the defendant contained additional information, not related by the detective in his description of the victim’s identification, which bore on the accuracy of her identification (see People v Dalton, 38 NY2d 222, 226-227 [1976]). Such evidence would have assisted the jury in evaluating the victim’s opportunity to observe her attacker and the overall accuracy of her identification (cf. People v Huertas, 75 NY2d 487, 493 [1990]; People v Bryan, 50 AD3d 1049, 1051 [2008]; People v Ragunauth, 24 AD3d 472, 473 [2005]). The Supreme Court’s rulings deprived the jury of its function of evaluating the consistency and accuracy of the victim’s identification when determining the weight to accord the defendant’s case (see People v Darrisaw, 206 AD2d 661, 664-665 [1994]; cf. People v Griffin, 161 AD2d 799, 801 [1990]).
*66 The proffered evidence further served to rebut the People’s theory of the victim’s identification. The People elicited testimony from the detective assigned to the case, who described how the victim identified Uppal as the perpetrator on two occasions while she was still in the hospital in the days following the attack. The People then preemptively attacked the credibility of the victim’s identification by presenting testimony from their expert witness, which indicated that the victim was experiencing dementia or delirium at that time. The People’s expert conceded that the hospital records and the fact that the victim was discharged in stable condition without restrictions tended to show that the victim was not experiencing dementia or delirium, but he sought to explain this evidence by indicating that the victim’s condition “fluctuated” and that she later became “much better.”
Consequently, the People’s case left the jury with the misleading impression that the victim’s identification of Uppal was an isolated event, made when the complainant was suffering from a temporary bout of dementia suffered in the wake of the attack. “Just as the People are allowed to rebut key assertions of the defense, the defendant also is allowed to attempt to disprove the People’s theory and rebut their key assertions” (People v Carroll, 95 NY2d 375, 386 [2000] [citation omitted]; see People v Hudy, 73 NY2d at 57-58). Here, the evidence proffered by the defendant rebutted the People’s theory of the case since it would have shown that the complainant identified Uppal as the perpetrator of the attack throughout the course of the year following the crime. In other words, the evidence that the defendant sought to present was not repetitive since it would have served to rebut the People’s theory of the case and dispelled any notion that the victim’s identification was merely the result of a mistake induced by her transient mental condition (see People v Dalton, 38 NY2d at 226-227; see also People v Carroll, 95 NY2d at 386; People v Hudy, 73 NY2d at 57-58).
We further reject the notion that evidence of the victim’s identification of the perpetrator would pose an undue risk of confusion of the issues. Even assuming, as the Supreme Court concluded, that the admission of the evidence proffered by the defendant would raise the issue of the victim’s state of mind, this issue was already placed squarely before the jury by the People, and had become a central issue in the case. Indeed, the People called an expert witness whose testimony was entirely devoted to that issue. Under the circumstances of this case, and *67 in light of the form and the substance of the evidence presented by the People, the preclusion of the defendant’s evidence of third-party culpability constituted error as a matter of law (see People v Primo, 96 NY2d at 357).
The People’s contention on appeal that the challenged evidentiary rulings may nevertheless be justified through application of the general rule against hearsay is misplaced, inasmuch as the Supreme Court did not base its rulings on that ground. Indeed, it specifically rejected that ground when it permitted the People to elicit similar hearsay evidence. Even if the People had not waived this contention by eliciting such evidence on their case-in-chief (cf. People v Brown, 57 AD3d 1461, 1462 [2008]; Zablow v DiSavino, 22 AD3d 748, 749 [2005]), their contention is without merit (see Chambers v Mississippi, 410 US at 302; People v Robinson, 89 NY2d at 654-657; People v James, 242 AD2d at 389-390).
Here, the defendant was deprived of his constitutional right to present a defense when the court precluded him from offering evidence that the victim in this case repeatedly and consistently identified another individual as the perpetrator of the alleged crime (see Holmes v South Carolina, 547 US 319 [2006]; Chambers v Mississippi, 410 US at 302-303; People v Robinson, 89 NY2d at 657; People v Bradley, 99 AD3d 934 [2012]; People v Oxley, 64 AD3d at 1083; People v Darrisaw, 206 AD2d 661 [1994]). “[A] constitutional error can be harmless only if the evidence of guilt, without reference to the error, is overwhelming, and there is no reasonable possibility that the error might have contributed to the defendant’s conviction, such that it is harmless beyond a reasonable doubt” (People v Dunbar, 104 AD3d 198, 214-215 [2013]; see Chapman v California, 386 US 18, 21-24 [1967]; People v Crimmins, 36 NY2d 230, 237 [1975]; People v Harris, 93 AD3d 58, 71 [2012], affd 20 NY3d 912 [2012]). It has been recognized that this “rigorous” standard (People v Gibian, 76 AD3d 583, 589 [2010]) places a “heavy burden” on the prosecution (People v Harris, 93 AD3d at 71 [internal quotation marks omitted]), and represents “perhaps the most demanding test yet formulated” (People v Crimmins, 36 NY2d at 241).
Here, while the stain on the defendant’s shirt and his statement to the police were legally sufficient to support the judgment of conviction, the fact remains that the conclusions that could be drawn from such evidence were directly contradicted by the victim’s repeated and unequivocal identification of *68 Uppal as the perpetrator. Additional evidence that the jury could have found consistent with the victim’s identification were the marks on Uppal’s body, which the jury could have concluded were the result of a recent struggle. Given the conflicting evidence as to whether the defendant was the perpetrator, the evidence of his guilt was not overwhelming, and thus “ ‘there is no occasion for consideration of any doctrine of harmless error’ ” (People v Parchment, 92 AD3d 699, 700 [2012], quoting People v Crimmins, 36 NY2d at 241; see People v Maldonado, 97 NY2d 522, 531 [2002]; People v Bailey, 58 NY2d 272, 278 [1983]).
Even if the People had presented overwhelming evidence of the defendant’s guilt, there is at least a reasonable possibility that the deprivation of the defendant’s constitutional right to present a defense might have contributed to the defendant’s conviction. The prosecutor utilized the victim’s description of the attack itself, but simultaneously asked the jury to reject her description of the perpetrator. The rationale for such parsing was premised on the theory that the victim’s mental condition in the days after the attack rendered the portion of her account relating to the identity of the perpetrator unreliable. The defendant was nevertheless deprived of any opportunity to rebut the People’s theory or present his own case. Here “the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the victim’s identification]” (Davis v Alaska, 415 US 308, 317 [1974]; see People v Ocampo, 28 AD3d 684, 686 [2006]). Had the defendant been permitted to show that the victim consistently identified another individual as the perpetrator throughout the course of the year following the crime, the People’s explanation for the victim’s identification would have been rebutted and “the prosecution’s case would have been weakened — perhaps considerably” (People v Ashner, 190 AD2d 238, 248 [1993]; see People v Ocampo, 28 AD3d at 686). In all, we conclude that there is a “reasonable possibility” that the deprivation of the defendant’s constitutional right to present a defense might have contributed to the conviction (People v Crimmins, 36 NY2d at 241 [internal quotation marks omitted]; see Chapman v California, 386 US at 21-24).
Even if this constitutional error alone could be considered harmless, additional errors, considered cumulatively with this constitutional error, would require reversal. Although these issues are unpreserved for appellate review since the defendant’s attorney failed to adequately raise objections or failed to seek *69 further relief when an objection was sustained, this is an appropriate case for this Court to exercise its interest of justice jurisdiction to reach the defendant’s contentions (see CPL 470.15 [6]; People v Jones, 51 AD3d 690, 692 [2008]).
The Supreme Court erred when it permitted the prosecutor to elicit testimony from the detective in which he explained why the charges against Uppal were dropped, inasmuch as the detective effectively conveyed his opinion that the defendant was guilty of the charges for which he was on trial (see People v Kozlowski, 11 NY3d 223, 240 [2008], cert denied 556 US 1282 [2009]; People v Anderson, 91 AD3d 789, 790 [2012]). It was also plainly improper for the prosecutor to elicit testimony from the defendant’s former girlfriend, in which she stated that she believed that the defendant had “something to do with” the incident, as this constituted nothing short of an additional witness indicating her belief that the defendant was guilty (see People v Russell, 165 AD2d 327, 332 [1991], affd 79 NY2d 1024 [1992]). As the defendant correctly contends, this testimony “invade[d] the jury’s exclusive province of determining an ultimate fact issue in the case” (People v Abreu, 114 AD2d 853, 854 [1985]; see People v Jones, 51 AD3d at 692 [reaching issue in the interest of justice]; People v Goodwine, 177 AD2d 708, 709 [1991]; People v Bajraktari, 154 AD2d 542, 543 [1989]).
The prejudicial effect of this improper opinion testimony was compounded by the prosecutor’s remarks in summation (see People v Robinson, 191 AD2d 595 [1993]). The prosecutor stated to the jury that the defendant’s former girlfriend left him because “she knew what he did.” The prosecutor went on to inform the jury that the detective knew that the case against Uppal “wasn’t correct,” and that “[h]e made it right” by later arresting and charging the defendant. It is proper to consider the enhanced prejudice occasioned by the prosecutor’s remarks in the context of a harmless error analysis (see e.g. People v Andujar, 105 AD3d 756, 757 [2013]; People v Agina, 103 AD3d 739 [2013]; People v Tucker, 87 AD3d 1077, 1081 [2011]; People v Robinson, 191 AD2d at 597).
The prejudicial effect of these additional errors again bore directly on the central issue in this case: the identity of the perpetrator. The fact that the defendant was deprived of his constitutional right to present evidence bearing on this central issue, considered cumulatively with the prejudicial effect of the improperly admitted opinion testimony, cannot be considered *70 harmless (see Chapman v California, 386 US at 21-24; People v Crimmins, 36 NY2d at 241; see also People v Gibian, 76 AD3d at 589).
Accordingly, the judgment is reversed, on the law, and a new trial is ordered.
In light of our determination, we need not reach the defendant’s contention that the Supreme Court’s closure of the courtroom during a portion of jury selection violated his right to a public trial and his contention that the Supreme Court considered improper factors in reaching its sentencing determination.
Angiolillo, J.E, Austin and Sgroi, JJ., concur.
Ordered that the judgment is reversed, on the law, and a new trial is ordered.