■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DERRICK LLOYD, Appellant. [981 NYS2d 792]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (Dwyer, J.), rendered June 2, 2011, convicting him of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, as a matter of discretion in the interest of justice, and a new trial is ordered.

On the morning of January 1, 1991, the defendant allegedly shot and killed a man in Brooklyn. According to the People's theory of the case, prior to the shooting, the defendant had left a nearby party at his sister's apartment, and was searching for an intoxicated man who had caused a disturbance at that party.

The defendant was not apprehended until 2007. The first jury trial ended in a hung jury. At the second jury trial, which commenced in 2011, the People introduced testimony from Rukaiyah Long-Akrum, Karima Crosby, and Cassandra Cannon, among others.

Long-Akrum, Crosby, and Cannon testified that, after failing to gain entry to the party, they sat down on a bench in a nearby courtyard. At approximately 3:00 a.m., the victim, William Smith, known as "Sha," joined the group. Thereafter, the defendant, appearing angry and upset, approached the group near the bench and, by one account, said, "I want to know where is the drunk guy who was beefing at the party," and, by another account, said, "Did you see the guy?"

The defendant and Smith engaged in a verbal altercation. Crosby testified at the second trial that she recognized the defendant as a man who had previously come to the door at the party when she had unsuccessfully attempted to gain entry thereto. According to Long-Akrum and Cannon, the defendant eventually pulled out a black handgun and shot Smith, who later died as a result.

Crosby, who testified that she did not see a gun at any point, identified the defendant as the shooter at the second trial, approximately 20 years afer the incident. However, when Crosby was questioned by law enforcement officials on the day of the shooting, she stated that she would not know the shooter if she saw him again, and that she had been intoxicated during the entire incident. That same day, Crosby failed to identify the defendant from a photo array, which included a photograph of the defendant. Crosby testified that she was initially unable to identify the defendant in 1991 because she was young and scared at the time, but at no time did she assert that she had actually recognized the defendant's photograph.

The defendant's sister, Ramona Lloyd (hereinafter Lloyd), and the defendant's girlfriend both testified on the defendant's behalf. The defendant's girlfriend testified that the defendant was with her throughout the night of the shooting, and Lloyd further testified that the defendant was not present at the party in her apartment. On cross-examination, Lloyd testified that, after the shooting, she and Patricia Drake, who was at the party, were brought to a police station for questioning. Over the defendant's objection, the prosecutor asked Lloyd whether a detective had showed her a picture of the defendant at the station, and Lloyd answered in the affirmative. When the prosecutor asked Lloyd whether she "wanted to know what [Drake] was telling . . . the detectives, that would make them show you a

picture of your brother, right?'', the trial court sustained defense counsel's objection. Further, the prosecutor asked Lloyd whether, after she left the police station, she had gone directly to Drake's apartment; Lloyd responded that she initially went home and subsequently visited Drake's apartment, where they had a "heated" conversation. The prosecutor asked Lloyd, over the defense counsel's objection, whether the conversation was heated because Lloyd had introduced Drake to the defendant at the party. Lloyd answered in the negative. Also over defense counsel's objection, the People were permitted to call a rebuttal witness who testified that Lloyd had told him that, after she left the police station, she went directly to Drake's apartment.

During the summation, the People argued that when the police showed Lloyd a picture of the defendant at the police station, she knew that someone had told the police that the defendant was involved in the incident and, therefore, Lloyd was angry because she knew that Drake was in another room speaking to the police. The trial court overruled defense counsel's objection, stating, "Yes. It's an argument for the jury to consider." The prosecutor further argued during summation that Lloyd went directly to Drake's apartment after leaving the police station "[b]ecause she wanted to know what . . . Drake said . . . about her brother being the one who had done this, and what was going on, and why the police were showing [Lloyd] a picture of her brother, asking her if that was her brother." The trial court overruled defense counsel's objection to that argument.

The jury deliberated over the course of four days. On its second day of deliberations, the jury asked the court, "Do we have any testimony or statement from [Patricia] Drake?", and the court responded that there was no such testimony or statement from Drake. The jury found the defendant guilty of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.

The defendant failed to preserve for appellate review his argument that his constitutional right to confront the witnesses against him (see US Const Sixth Amend; NY Const, art I, § 6) was violated by certain of the prosecutor's questions on cross-examination and summation remarks that were phrased in such a manner as "to create in the jurors' minds the impression" that a nonwitness had made statements to the police implicating the defendant (People v Jones, 305 AD2d 698, 699 [2003]; see People v Berry, 49 AD3d 888, 889 [2008]; People v Almonte, 223 AD2d 593, 594 [1996]) because he failed to raise this specific

argument at trial (*see* CPL 470.05 [2]; *People v Waters*, 91 AD3d 977 [2012]; *People v Edwards*, 81 AD3d 848 [2011]). Nevertheless, we conclude that this is an appropriate case in which to exercise our interest of justice jurisdiction to reach the defendant's contentions in this regard (*see* CPL 470.15 [3] [c]; [6]).

Generally, during cross-examination, a party cannot introduce extrinsic evidence or call another witness to contradict a witness's answers concerning collateral matters solely for the purpose of impeaching such witness's credibility (*see People v Pavao*, 59 NY2d 282, 288-289 [1983]). As the defendant correctly contends, during the cross-examination of Lloyd, the prosecutor improperly gave the impression that Drake, who did not testify, implicated the defendant while the police questioned her (*see People v Nesbitt*, 77 AD3d 854, 856 [2010]; *People v Berry*, 49 AD3d at 889; *People v Jones*, 305 AD2d at 699; *see also People v Mendez*, 22 AD3d 688, 689 [2005]). Notably, the prosecutor acknowledged at the second trial that Drake had testified at the initial trial, and that Drake had not identified the defendant as having been present at the party.

The defendant's constitutional right to be confronted with the witnesses against him prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he [or she] was unavailable to testify, and the defendant ha[s] had a prior opportunity for cross-examination" (*Crawford v Washington*, 541 US 36, 53-54 [2004]; *see People v Pealer*, 20 NY3d 447, 453 [2013], *cert denied* 571 US —, 134 S Ct 105 [2013]). Here, the defendant's constitutional right to be confronted with the witnesses against him was violated.

This error was exacerbated when the prosecutor, during summation, improperly argued that Lloyd went to Drake's home after leaving the police station because Lloyd was concerned that Drake had implicated the defendant in the shooting. Moreover, when the trial court overruled defense counsel's timely objection, it legitimized the prosecutor's improper argument (*see People v Ashwal*, 39 NY2d 105, 111 [1976]; *People v Bannerman*, 110 AD2d 706 [1985]). The trial court further erred in permitting the People, over defense counsel's objection, to elicit the rebuttal testimony that showed that Lloyd went directly to Drake's home after leaving the police station.

"A constitutional error may be harmless where evidence of guilt is overwhelming and there is no reasonable possibility that it affected the outcome of the trial" (*People v Best*, 19 NY3d 739, 744 [2012]; *see People v Thompson*, 111 AD3d 56, 67 [2013]). Our dissenting colleague would find that any error would be harmless. We disagree. Even if there were overwhelm-

ing evidence of the defendant's guilt, there exists a reasonable possibility that the error contributed to the defendant's conviction since, among other things, the second trial was conducted approximately 20 years after the homicide and the jury's deliberations, which took place over the course of four days, included a request for a readback of a statement by or testimony from Drake, which proved to be nonexistent (*see People v Crimmins*, 36 NY2d 230, 240-241 [1975]).

Accordingly, the judgment must be reversed, and a new trial must be conducted.

The defendant's remaining contention has been rendered academic in light of our determination. Balkin, J.P., Leventhal, And, Austin JJ., concur.

Roman, J., dissents and votes to affirm the judgment, with the following memorandum: While the majority finds that the prosecutor's questioning and summation remarks improperly created the impression that Patricia Drake had implicated the defendant in the shooting, I disagree with the conclusion that these errors require reversal of the defendant's convictions. In my view, the other evidence of the defendant's guilt, which included the testimony of three disinterested eyewitnesses to the shooting and additional corroborating evidence, was overwhelming, and there was no reasonable possibility that the errors complained of contributed to the defendant's convictions (*see People v Crimmins*, 36 NY2d 230, 237 [1975]; *People v Taylor*, 40 AD3d 782, 785 [2007]). Therefore, I respectfully dissent.

At the second trial, the aforementioned witnesses, Rukaiyah Long-Akrum, Karima Crosby, and Cassandra Cannon, testified that, in the early hours of January 1, 1991, they were sitting on a bench outside 5624 Farragut Road in Brooklyn with several other friends, including William Smith, when they observed the defendant emerge from that building. The defendant approached the group, and asked whether they had seen an individual who had been at a party upstairs.

The three witnesses consistently described the defendant as a light-skinned male, wearing a Kufi-style cap, and Crosby and Cannon recalled that the defendant had facial hair and wore a light-colored sweater. The witnesses testified that when nobody responded to the defendant, he demanded "answers." According to two of the witnesses, Smith replied to the defendant that "everyone wants answers but we can't always have them." The three witnesses agreed that the defendant and Smith started to argue, and maneuvered themselves behind the bench.

At this point, Long-Akrum and Cannon observed the defend-

ant pull out a gun. Long-Akrum and Crosby both testified that Smith said, "If you're going to bust me, bust me now," or "If you're going to buzz me, buzz me now." Long-Akrum and Cannon then observed the defendant shoot Smith in the face. While Crosby did not see the defendant holding the gun, she testified that she heard a single gunshot, and then saw Smith lying on the ground. There is no indication that any other person in the vicinity had a gun, and Long-Akrum testified that there was nobody else out in the courtyard where the shooting took place other than her group of friends and the defendant. Immediately after the shooting, the witnesses ran to Crosby's apartment, where Long-Akrum called the police to report the incident. Based on the police investigation that same day, January 1, 1991, the defendant became a suspect in the shooting.

The witnesses' testimony regarding the shooting was consistent with the forensic evidence, which showed that Smith died of a single gunshot wound to the face caused by a .380 caliber bullet, and that one .380 caliber shell casing was recovered from the scene of the crime. Moreover, as the People correctly point out, the witnesses' testimony was corroborated by extensive circumstantial evidence, including that the shooting occurred in the same housing project complex where the defendant resided, and in which Crosby had seen the defendant at a New Year's Eve party at the apartment of the defendant's sister just before the shooting.

While the majority points out that Crosby had consumed alcohol on the night of the shooting, this fact was fully explored at trial and did not render Crosby's testimony incredible, especially when considered cumulatively and in conjunction with the testimony of the other eyewitnesses (*see People v Littebrant*, 55 AD3d 1151, 1155 [2008]; *see also People v Thompson*, 75 AD3d 760, 763 [2010]; *People v Dennis*, 223 AD2d 599, 600 [1996]). Indeed, the record reveals that the "witnesses related their observations in a logical and lucid manner at trial" (*People v Washington*, 143 AD2d 707, 707 [1988] [rejecting the defendant's contention that his guilt was not established beyond a reasonable doubt by the testimony of two prosecution witnesses who were concededly intoxicated at the time they made their observations relating to the crime]).

In addition, although the second trial was conducted approximately 20 years after the homicide, this delay was caused by the defendant's departure from New York shortly after the shooting. The defendant moved to Alabama and started using the name Rasheed Hamid (*see People v Lendore*, 36 AD3d 940, 940 [2007] ["Evidence of flight is admissible as circumstantial

evidence of consciousness of guilt"]). Notably, the defendant's girlfriend, Karen Wynter, testified that, after New Year's Day, January 1, 1991, the next time she heard from the defendant was in mid-January 1991, and that he was then "down south." The defendant was ultimately apprehended in August 2007, after he tried to obtain a driver's license in Alabama under his alias by using forged documentation.

Further, the jury did not specifically request a readback of any particular statement by, or testimony of, Patricia Drake. Rather, the jury sent out a note, designated as "Number two," in which it asked, "do we have any testimony or statement from Drake?" The court responded as follows: "Number two is easy. The parties agree there is no testimony or statement from Drake, who, of course, was not a witness at this trial." Thus, the jury was aware that Drake did not provide any statement or testimony at the second trial.

Finally, while the majority correctly points out that the jury deliberated over the course of four days, the record reflects that the jury only deliberated for approximately one hour on the first day.

Accordingly, in light of the foregoing, I conclude that reversal of the defendant's conviction is not warranted because the errors complained of were harmless beyond a reasonable doubt (*see People v McAuliffe*, 36 NY2d 820 [1975] [the admission of testimony from a police officer that created an erroneous impression that a major nontestifying witness had implicated the defendant before the grand jury was harmless beyond a reasonable doubt, where the other evidence of the defendant's guilt, including the testimony of three witnesses regarding the defendant's role in the crime, was overwhelming, and there was no reasonable possibility that the error might have contributed to his conviction]; *People v James*, 289 AD2d 506 [2001]; *People v Means*, 152 AD2d 751, 751-752 [1989]).