People v Huertas (2020 NY Slip Op 04577)





People v Huertas


2020 NY Slip Op 04577


Decided on August 19, 2020


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 19, 2020
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

CHERYL E. CHAMBERS, J.P.
SHERI S. ROMAN
JEFFREY A. COHEN
BETSY BARROS
LINDA CHRISTOPHER, JJ.


2011-02520
 (Ind. No. 791/08)

[*1]The People of the State of New York, respondent,
v
Edmond Huertas, appellant.


Paul Skip Laisure, New York, NY (De Nice Powell of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, and Kathryn E. Mullen of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (Robert C. McGann, J.), rendered March 2, 2011, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Robert Hanophy, J.), of that branch of the defendant's omnibus motion which was to suppress evidence of a law enforcement official's observations of him.
ORDERED that the judgment is affirmed.
The defendant was charged with, inter alia, murder in the second degree for shooting his girlfriend in the head on June 2, 2007, resulting in her death. At the jury trial, the People presented the testimony of the victim's close friends, Melissa Roman and Frances Eames. Both witnesses, who resided together, testified that on June 2, 2007, they had several telephone calls with the victim using the direct connect, or "walkie-talkie," function on their cell phones. Roman testified that during one of these calls the victim sounded upset and as if she had been crying.
During a subsequent call, Roman overheard the victim on speaker phone make a request to be picked up from her apartment. The defendant, the victim's live-in boyfriend, then said over the phone that "she's not coming." Both Roman and Eames knew the defendant very well. Roman testified that the defendant directed her, over the speaker phone, to "listen." Following that directive, she heard a "[l]oud sound." A second or two after she heard the sound, the defendant told her that he had "just killed [the victim]." Eames testified that after she was alerted to the conversation by Roman, she called the victim's phone. The defendant answered, and twice stated that he had just killed the victim.
Roman and Eames immediately drove to the victim's apartment. The trip took approximately 10 minutes, and when they arrived they observed the defendant standing inside the apartment holding a black gun. The witnesses also observed the victim seated in a slumped position on the living room couch with her head leaning against the back of the couch. She was making gurgling noises, her hair was soaked in blood, and there was blood on the couch behind her head. [*2]The defendant eventually left the apartment holding the gun.
The victim subsequently died. A medical examiner employed by the Office of the Chief Medical Examiner for the City of New York testified that the victim's cause of death was a penetrating gunshot wound to the head.
On June 7, 2007, the police went to an apartment building in Brooklyn looking for the defendant. When a detective opened the door to an apartment on the third floor of the building, he observed the defendant run toward the rear of the apartment. The defendant was found hiding in one of the apartment's bedrooms, wedged between a bunk bed and the wall, covered by a blanket. He was taken into custody, and was subsequently charged with, inter alia, murder in the second degree and criminal possession of a weapon in the second degree.
At the conclusion of the trial, the jury returned a verdict convicting the defendant of murder in the second degree and criminal possession of a weapon in the second degree.
On appeal, the defendant contends that the Supreme Court should have suppressed, based on Payton v New York (445 US 573), testimony regarding observations of the defendant made by a detective in the apartment where the defendant was arrested. However, the defendant's contention is unpreserved for appellate review (see CPL 470.05[2]). In any event, this contention is without merit. The evidence at the pretrial suppression hearing established that the defendant did not reside at the apartment where he was arrested, and the defendant failed to establish a legitimate expectation of privacy in the apartment (see People v Bell, 5 AD3d 858, 860-861; People v Phillips, 118 AD2d 600, 601; People v De Moss, 106 AD2d 395, 397-398).
The defendant contends that part of a recording of a 911 emergency telephone call made by Roman after she found the victim following the shooting should not have been admitted into evidence at trial because the recorded statements were hearsay. This contention is unpreserved for appellate review (see CPL 470.05[2]; People v Perez, 167 AD3d 1049, 1050), and, in any event, without merit. The portion of the 911 call at issue was properly admitted under the excited utterance exception to the hearsay rule, since the recording evidenced that the witness was under the influence of the excitement of the incident and lacked the reflective capacity essential for fabrication (see People v Hutchinson, 167 AD3d 653, 654; People v Leak, 129 AD3d 745, 746).
We agree with the Supreme Court's determination to permit Roman and Eames to testify regarding out-of-court statements made by the victim that the defendant had previously assaulted her on two occasions. The victim's out-of-court statements were not admitted for their truth, but to explain the witnesses' state of mind and their subsequent actions on the date of the murder (see People v Harris, 19 NY3d 679, 686; People v Rose, 41 AD3d 742, 742-743; People v Johnson, 40 AD3d 1011, 1012; cf. People v Brooks, 31 NY3d 939, 942; People v Meadow, 140 AD3d 1596, 1598-1599). Additionally, the court properly instructed the jury on the limited purpose of this testimony (see People v Rose, 41 AD3d at 743; People v Johnson, 40 AD3d at 1012).
Prior to trial, the Supreme Court ruled that if the defendant were to testify that the shooting was an accident, the People would be permitted to offer evidence, through their cross-examination of him, of the facts underlying his three prior gun-related convictions (see People v Molineux, 168 NY 264). The defendant contends that this ruling deprived him of his due process right to a fair trial as it deterred him from testifying at trial. Contrary to the defendant's contention, and the position of our dissenting colleagues, the court's Molineux ruling did not deprive the defendant of his right to a fair trial (see People v Crimmins, 36 NY2d 230, 237-238; People v Cunny, 163 AD3d 708, 710). Moreover, any error in the ruling was harmless, as there was overwhelming evidence of the defendant's guilt and no reasonable possibility that any error might have contributed to the defendant's conviction (see People v Crimmins, 36 NY2d at 237).
The evidence at trial overwhelmingly demonstrated that the shooting was intentional. The People presented testimony from, among others, Roman and Eames, who each testified that the defendant confessed to killing the victim. Additionally, just before Roman heard the gunshot over [*3]the telephone, the defendant had told her that the victim would not be coming to Roman's apartment and had directed her to "listen." Roman's testimony concerning her telephone conversation with the defendant was substantially corroborated by the recording of her emotional telephone call to 911. Furthermore, when Roman and Eames arrived at the victim's apartment, they observed the defendant standing inside holding a black gun, and the victim seated in a slumped position on the living room couch, making gurgling noises, and her hair was soaked in blood. There was no evidence that the defendant called for help. Instead, the defendant fled the apartment with the gun.
Moreover, the forensic evidence was consistent with an intentional shooting. The medical examiner testified that the gunshot wound was "to the back of the left side of the head . . . located slightly above and behind the left earlobe." The medical examiner also testified that the trajectory of the bullet was downward. Under the circumstances, there is no reasonable possibility that a ruling more favorable to the defendant would have affected the result (see People v Grant, 7 NY3d 421, 425; People v Crimmins, 36 NY2d at 237; People v Cunny, 163 AD3d at 710; People v Reese, 181 AD2d 699, 700).
Contrary to the defendant's contention, he was not deprived of the effective assistance of counsel under the New York Constitution since, viewing defense counsel's performance in totality, counsel provided meaningful representation (see People v Benevento, 91 NY2d 708, 712; People v Baldi, 54 NY2d 137, 146-147). Further, the defendant was not deprived of the effective assistance of counsel under the United States Constitution (see Strickland v Washington, 466 US 668).
The defendant's contention that the judgment of conviction should be reversed based on the unavailability of a portion of the trial minutes is without merit (see People v Parris, 4 NY3d 41, 44, 46-47). Furthermore, the defendant failed to establish his entitlement to a reconstruction hearing (see id. at 48-49).
The defendant's remaining contentions are unpreserved for appellate review and, in any event, without merit.
ROMAN, COHEN and CHRISTOPHER, JJ., concur.
CHAMBERS, J.P., dissents, and votes to reverse the judgment, on the law, and order a new trial, with the following memorandum, in which BARROS, J., concurs:
Because I believe that the totality of the record shows that the defendant was deprived of his constitutional rights to testify, to present a defense, and, ultimately, to a fair trial, I respectfully dissent. Moreover, the error was not harmless inasmuch as the evidence of the defendant's guilt of an intentional murder was not overwhelming under the unique factual circumstances of this case.
The Trial Evidence
At trial, the victim's friend, Melissa Roman, testified that, on June 2, 2007, at approximately 2:14 P.M., while the defendant was on the phone with her, he told her to "listen," at which point Roman heard a "loud," "weird," "muffled," "metal clanging" noise, and then the defendant announced that he had "just killed" the victim. Roman's roommate, Frances Eames, also testified that the defendant made the same statement to her over the phone moments later, i.e., that he had "just killed" the victim.
Asked whether they believed the defendant's statements that he had just killed the victim, Roman and Eames admitted that they did not, so they did not immediately call the police. Instead, they drove to the victim's apartment, which was approximately 10 minutes away. Upon their arrival, they entered the apartment building, walked through the hallway to the door of the victim's apartment, and found the defendant standing near the open door to the apartment, with a gun in his hand. While the defendant initially told Roman and Eames that they could not go into the apartment, he let them inside. Upon seeing the victim bleeding from the head, unresponsive and [*4]slumped on a couch, Eames and Roman yelled at the defendant—who was still holding the gun—to leave, and he left. Roman then called the 911 emergency number at approximately 2:35 P.M. The victim was pronounced dead two days later. A subsequent autopsy of the victim's body revealed that the cause of death was a gunshot wound to the head, the bullet having entered behind the left earlobe with a downward, left to right, front to back trajectory, ending up in an area behind the right ear. There was no evidence of stippling or fouling, and the relative positions of the victim and the shooter could not be determined by the medical examiner. Moreover, apart from the physical injury caused by the bullet itself, the only other evidence of physical injury to the victim was a single abrasion behind the left earlobe. The gun was never recovered, and no fingerprints of value were recovered from the crime scene.
The Defendant's Claim of Accident
Following his arrest, in a handwritten statement given several days after the shooting, the defendant admitted shooting the victim, but claimed he had done so accidentally during a struggle with the victim over the gun. However, the jury never learned of the defendant's statement to the police.
In their direct case, the People did not introduce the defendant's statement into evidence, and the Supreme Court denied, on hearsay grounds, the defendant's subsequent application to admit the statement.
The Sandoval/Molineux Rulings
Because a portion of the court reporter's transcript of the proceedings was lost, there is no record of the defendant's Sandoval application (see People v Sandoval, 34 NY2d 371). However, subsequent to a combined Sandoval/Molineux hearing, the Supreme Court initially ruled, in relevant part, that if the defendant testified, the People would be permitted to elicit the fact he was convicted of attempted robbery in 1992, and the facts underlying the conviction. Regarding the defendant's 1994 conviction for possession of a weapon, the court limited the cross-examination of the defendant to eliciting the date of the conviction and referring to the conviction as a felony. Finally, the court ruled that the prosecutor would be allowed to ask whether the defendant had been convicted of attempted murder in the second degree in 1994, but not the underlying facts.
As relevant here, immediately after the Supreme Court's Sandoval ruling, the prosecutor moved in limine, pursuant to People v Molineux (168 NY 264), to cross-examine the defendant regarding all of the underlying facts of his three prior gun-related convictions, i.e., the 1992 attempted robbery and the 1994 attempted murder and weapon possession convictions, if the defendant were to testify consistent with his prior written statement that the shooting was an accident. The court granted the People's motion.
The Defendant's Decision Not to Testify
After the close of the People's case, defense counsel asked the Supreme Court to reconsider its prior Molineux ruling. Defense counsel expressed to the court his intention of calling his client to the stand to testify consistent with his prior statement to the police that the shooting was an accident. He argued that, while he did not object to the court's initial Sandoval ruling, he objected to the court's further Molineaux ruling on the ground that it "would totally give him no chance whatsoever to tell his story," and would "make[ ] it impossible . . . for him to take the stand." The court stated that it would not reconsider the ruling unless and until the defendant took the stand. The court observed: "I have no way of knowing . . . what your client will say and I have no way of knowing that nor is it my business to know what it is nor to ask what it will be." At that point, defense counsel informed the court that he had "a good idea what opening the door is and I believe if he testified the door would be open." Defense counsel then responded, after he unsuccessfully sought the admission of the defendant's written statement, that he "was compelled to rest at this time" in light of the court's decision.
Summations
In summation, defense counsel remarked: "What happened after [the defendant] was arrested? Was he interrogated?" The court immediately sustained an objection by the prosecutor and reminded the jury that it was "to confine [its] deliberations to the evidence and reasonable inferences to be drawn from the evidence in the case." However, when the prosecutor, just minutes later, rhetorically asked "[w]hy isn't [the defendant] talking to the police? Why isn't he telling them what happened[?]", the court overruled defense counsel's objection to the remark.
Deliberations and Verdict
Deliberations began on February 15, 2011, and continued well into the next day, with the jury sending numerous notes requesting, inter alia, read-backs of the testimony of Eames and Roman, a play-back of Roman's 911 call, and re-instructions on the distinction between direct and circumstantial evidence.
On February 16, 2011, the jury found the defendant guilty of murder in the second degree and criminal possession of a weapon in the second degree.
The Applicable Law
As a threshold matter, if the defendant had testified that the subject shooting was an accident, proof concerning the underlying facts of his decades-old prior gun-related convictions had no relevance to any material issue in the case and tended only to demonstrate the defendant's general criminal propensity. Therefore, such evidence should have been excluded pursuant to the Molineux rule (see People v Irby, 79 AD2d 713, 714).
However, I acknowledge that our jurisprudence reflects that there are many cases in which a defendant may "open the door" to otherwise inadmissible evidence of prior crimes—even outside of the scope of Molineux. For example, in People v Rojas (97 NY2d 32), the defendant, while housed in a segregated unit of the jail, assaulted a guard. In its initial Molineux ruling, the court precluded the People from introducing evidence that the defendant had been placed in the segregated unit as a result of his attempt to assault another inmate. However, after defense counsel tried to show that the defendant's placement in a segregated unit was harsh and unjustifiable punishment, notwithstanding its prior Molineux ruling, the court permitted the prosecution to introduce the challenged evidence.
In a recent case, People v Simpson (173 AD3d 1617), where the defendant was charged with manslaughter, the Appellate Division, Fourth Department, upheld a Molineux ruling allowing the introduction of evidence that the defendant had previously stabbed the same victim as probative of the fact the defendant did not accidentally or mistakenly stab the victim, but rather had the intent to cause serious injury in the subject instance just as he allegedly did on a prior occasion.
In People v Diggins (11 NY3d 518)—on which the People rely—the prosecution was allowed to elicit evidence of the defendant's prior gun-related convictions to rebut the defendant's factual statement that he accidentally shot the victim because "he was unaccustomed to handling firearms" (id. at 525), with appropriate limiting instructions.
Here, by contrast, the fact that the defendant committed gun-related offenses against persons other than the victim nearly 20 years before the subject shooting bears no relevance whatsoever to the issue of whether the subject shooting was an accident. In my view, permitting the People to elicit the underlying facts of prior gun-related acts that were totally unrelated to the victim would serve only to demonstrate that the defendant had a propensity for gun violence (see People v Ball, 154 AD3d 1060, 1063-1064; People v Park, 12 AD3d 942, 943-944; People v Fuller, 197 AD2d 881; People v Irby, 79 AD2d 713). Consequently, the Supreme Court's pretrial ruling in this case cannot be justified under Molineux and, thus, the ruling effectively precluded the defendant from presenting a defense.
At the outset, it is necessary to note that the right to present a defense constitutes a fundamental element of due process of law (see People v Bradley, 99 AD3d 934, 936; People v Taylor, 40 AD3d 782, 784). Here, the Supreme Court's Molineux ruling not only deterred the defendant from exercising his constitutional right to testify, but in the end also prevented the jury from hearing and considering the defendant's contention that the shooting was an accident (see People v Grant, 7 NY3d 421, 424-425; People v Ridenhour, 153 AD3d 942, 944).
Further, inasmuch as the erroneous Molineux ruling deprived the jury of "significant material evidence" (People v Grant, 7 NY3d at 424), the defendant's self-standing right to a fair trial was compromised, "and proof of guilt, however overwhelming, can never be permitted to negate this right" (People v Crimmins, 36 NY2d 230, 238; see People v Nelson, 27 NY3d 361, 371-372). Thus, the harmless error doctrine arguably has no application under the unusual circumstances presented.
Alternatively, even if the infringement of the defendant's right to present a defense could somehow be construed as something less than a deprivation of his right to a fair trial—a difficult conclusion to reach in light of prior cases describing the right to present a defense as "one of the minimum essentials of a fair trial'" (People v Gibian, 76 AD3d 583, 585, quoting Chambers v Mississippi, 410 US 284, 294; see People v Hall, 160 AD3d 210, 213; People v Bradley, 99 AD3d at 936)—the error is, at the very least, subject to constitutional harmless error analysis (see Crane v Kentucky, 476 US 683, 691; People v Arnold, 147 AD3d 1327, 1328; People v Krut, 133 AD3d 781, 783; People v Lyons, 112 AD3d 849, 850; People v Thompson, 111 AD3d 56, 67; People v Taylor, 40 AD3d at 785), particularly as the defendant's trial counsel made abundantly clear, on the record, that his client would have exercised his constitutional right to testify but for the Supreme Court's Molineux ruling (see People v Grant, 7 NY3d at 424).
Significantly, there were no eyewitnesses to the shooting and the forensic evidence did not preclude the possibility that the shooting was an accident. Thus, the trial evidence of the defendant's intent to kill the victim rested entirely on the credibility of Roman and Eames as to what they heard over the phone at or near the time of the shooting. Notably, Roman's testimony that she heard a "loud," "weird," "muffled," "metal clanging" noise is, to say the least, an odd description of what purports to be a gunshot, and the statement attributed to the defendant announcing to both Roman and Eames that he had "just killed" the victim, is ambiguous at best as to what his intent might have been. Critically, in their account, Roman and Eames admitted that they did not call the police right away because they did not believe that the defendant had just shot the victim. After arriving at the apartment and observing the victim bleeding and unresponsive, it was Roman and Eames who pressed the defendant to leave the apartment. Moreover, the record shows that Eames had previously lied under oath in a criminal proceeding against her for possession of cocaine and driving with a suspended license, and she asserted her Fifth Amendment right against self-incrimination when asked whether she had previously earned money from the sale of drugs.
While the sequence of events amounted to compelling evidence that the defendant shot the victim, the pivotal question of whether the shooting amounted to intentional murder—as opposed to an accidental or reckless act—is far less clear. Thus, even assuming that harmless error analysis applies in this case, the error cannot be considered harmless beyond a reasonable doubt.
Finally, for the sake of completeness, even if the Supreme Court's Molineux error is somehow deemed not to amount to an abuse of discretion (compare People v Myers, 22 NY3d 1010, with People v Agina, 18 NY3d 600), I would still, at minimum, consider it an improvident exercise of discretion under the circumstances of this case (see People v Agina, 103 AD3d 739). Either way, a new trial is warranted.
ENTER:
Aprilanne Agostino
Clerk of the Court